## BEMENT *v.* NATIONAL HARROW COMPANY.

ERROR TO THE SUPREME COURT OF THE STATE OF NEW YORK.

No. 215. Argued April 9, 10, 1902. — Decided May 19, 1902.

Any one sued upon a contract may set up, as a defence, that it is a violation of an act of Congress.

The object of the patent laws is monopoly, and the rule is with few exceptions, that any conditions which are not in their very nature illegal with regard to this kind of property, imposed by the patentee, and agreed to by the licensee for the right to manufacture or use or sell the article, will be upheld by the courts; and the fact that the conditions in the contracts keep up the monopoly, does not render them illegal. The prohibition was a reasonable prohibition for the defendant, who would thus be excluded from making such harrows as were made by others, who were engaged in manufacturing and selling other machines under other patents; but it would be unreasonable to so construe the provision, as to prevent the defendant from using any letters patent legally obtained by it and not infringing patents owned by others.

Upon the facts found, there was no error in the judgment of the Court of Appeals, and it is affirmed.

THIS was a writ of error to the Supreme Court of the State of New York, to which court the record had been remitted after a decision of the case by the Court of Appeals. The action was brought by the plaintiff below, the defendant in error here,

a corporation, to recover the amount of liquidated damages arising out of an alleged violation by the defendant below, the plaintiff in error here, also a corporation, of certain contracts executed between the parties, in relation to the manufacture and sale of what are termed in the contracts "float spring tooth harrows," their frames and attachments applicable thereto, under letters patent owned by the plaintiff. The action was also brought to restrain the future violation of such contracts, and to compel their specific performance by the defendant. The case was tried before a referee pursuant to the statute of New York providing therefor, and he ordered judgment in favor of the plaintiff for over twenty thousand dollars, besides enjoining the defendant from violating its contract with the plaintiff, and directing their specific performance as continuing contracts. This judgment was reversed by the appellate division of the Supreme Court and an order made granting a new trial, but on appeal from such order the Court of Appeals reversed it and affirmed the original judgment. The defendant brings the case here by writ of error.

The particular character of the action appears from the pleadings. The complaint, after alleging the incorporation of both parties to the action, the plaintiff in New Jersey and the defendant in Michigan, averred that about April 1, 1891, the plaintiff's assignor, a New York corporation, entered with the defendant into certain license contracts, called therein Exhibits A and B. The substance of contract A is as follows: It stated that the plaintiff was the owner of certain letters patent of the United States, which had been issued to other parties and were then owned by the plaintiff, for improvements relating to float spring tooth harrows, harrow frames and attachments applicable thereto, eighty-five of which patents were enumerated, and that the defendant desired to acquire the right to use in its business of manufacturing at Lansing, (in the State of Michigan,) and to sell throughout the United States, under such patents or some one or more of them, and under all other patented rights owned or thereafter acquired by the plaintiff, which applied to and embraced the peculiar construction employed by the defendant, during the term of such patents or either or any

thereof, applicable to and embracing such construction. The plaintiff then, in and by such contract, gave and granted to the defendant the license and privilege of using the rights under those patents in its business of manufacturing, marketing and vending to others to be used, float spring tooth harrows, float spring tooth harrow frames without teeth and attachments applicable thereto; a sample of the harrow frames and attachments the defendant was licensed to manufacture and sell, being (as stated) in the possession of the treasurer of the plaintiff, and marked and numbered as set forth in schedule A, which was made a part of the license. The license was granted upon the terms therein set forth, which were as follows:

(1) The defendant was to pay a royalty of one dollar for each float spring tooth harrow or frame sold by it pursuant to the license, to be paid to the plaintiff at its office in the city of Utica in the State of New York.

(2) The defendant was to make verified reports of its business each month and mail them to the plaintiff, and the defendant agreed that it would not ship these harrows to any person, firm or corporation to be sold on commission, or allow any rebate or reduction from the price or prices fixed in the license, except to settle with an insolvent debtor for harrows previously sold and delivered.

(3) The defendant agreed that it would not during the continuance of the license sell its products manufactured under the license at a less price or on more favorable terms of payment and delivery to the purchasers than was set forth in schedule B, which was made a part of the license, except as thereinafter provided.

(4) The plaintiff reserved the right to decrease the selling price and to make the terms of payment and delivery more favorable to the purchasers, and it might reduce the royalty on the harrows manufactured under the license.

(5) The plaintiff agreed to furnish license labels to the defendant, which were to be affixed to each article sold, and the amount of ten cents paid for each of such labels was to be credited and allowed on the royalty paid by the defendant at the time of such payment.

(6) The defendant agreed that it would not, during the continuance of the license, be directly or indirectly engaged in the manufacture or sale of any other float spring tooth harrows, etc., than those which it was licensed to manufacture and make under the terms of the license, except such as it might manufacture and furnish another licensee of the National Harrow Company, and then only such constructions thereof as such other licensee should be licensed by the plaintiff to manufacture and sell, except such other style and construction as it might be licensed to manufacture and sell by the plaintiff.

(7) The defendant agreed to pay to the plaintiff for each and every of the articles sold contrary to the strict terms and provisions of the license, the sum of five dollars, which sum was thereby agreed upon and fixed as liquidated damages.

(8) The defendant agreed not to directly or indirectly, in any way, contest the validity of any patent applicable to and embracing the construction which the defendant was licensed to manufacture, or which it might manufacture, for another licensee, which such other licensee was itself licensed to manufacture or sell, or the reissues thereof, and no act of either party should invalidate this admission. The defendant also agreed not to alter or change the construction of the float spring tooth harrows, float spring tooth harrow frames, without teeth or attachments applicable thereto, which it was authorized to manufacture and sell under the license, in any part or portions thereof which embody any of the inventions covered by the letters patent, or any of them, or any reissues thereof.

(9) The plaintiff agreed that after the license was delivered it would not grant licenses or let to any other person the right to manufacture the articles named of the peculiar style and construction or embodying the peculiar features thereof used by the defendant, as illustrated and embodied in the sample harrow then placed in the possession of the treasurer of the plaintiff and referred to in schedule A of the license.

(10) Nothing contained in the license was to authorize the defendant to manufacture or vend, directly or indirectly, any other or different style of harrow than duplicates of such sam-

ples as had been deposited by it with the plaintiff, and such as were embraced in the license.

(11) Any departure from the terms of the license might at the option of the plaintiff be treated as a breach of the license, and the licensee might be treated as an infringer, or the plaintiff might restrain the breach thereof in a suit brought for that purpose and obtain an injunction, the licensee waiving any right of trial by jury; such remedy was to be in addition to the liquidated damages already provided for.

(12) The termination of the license by the plaintiff was not to release the defendant from its obligation to pay for articles sold up to the termination of the license.

(13) The plaintiff agreed to defend the defendant in any suit brought for an alleged infringement.

(14) No royalties were to be paid for articles exported for use in a foreign country.

(15) The license was personal to the licensee and not assignable, except to the successors of the defendant in the same place and business, without the written consent of the plaintiff, nor were the royalties or other sums specified to cease to be paid under any circumstances, except under the conditions named in the license during the continuance thereof.

(16) The parties agreed that the license should continue during the term of the patent or patents applicable to the license and during the term of any reissues thereof.

(17) The place of the performance of the agreement was the city of Utica, New York, and the agreement was to be construed and the rights of the parties thereunder determined according to the laws of New York.

(18) The consideration of the contract or license was one dollar, paid by each of the parties to the other, and the covenants contained therein to be performed by the other, and it applied to and bound the parties thereto, their successors, heirs and assigns.

Schedule A which followed contained a description of the particular kinds of harrow which the defendant was authorized to make and sell under the license. Schedule B contained a statement of the prices and terms of sale under the license, and it was

therein stated that "A maximum discount of forty-two per cent may be allowed on sales of harrows, frames and teeth in the following territory: All of the New England States, also States of New York, Pennsylvania, New Jersey, Delaware, Maryland, Virginia and West Virginia. A maximum discount of forty-five per cent may be allowed on all sales in the territory throughout the United States not mentioned above."

This contract or license was signed by the president of the National Harrow Company for the plaintiff, and A. O. Bement, president of the defendant corporation, for the defendant.

The other license, called Exhibit B, was in substance the same as Exhibit A, excepting that the privilege of sale for the articles manufactured was that portion of the territory embraced within the United States lying south, and west of Virginia, West Virginia and Pennsylvania, and there was some difference in the machines which the defendant was authorized to manufacture and sell under this license, and in regard to the prices to be charged for those machines not covered by the former contract or license.

These two agreements were, as stated, made parts of the plaintiff's complaint, and the plaintiff then set forth various alleged violations of the two agreements on the part of the defendant, and claimed a recovery of a large amount of damages under the provisions of the contracts, and prayed for an injunction restraining future violations and for a specific performance of the contracts.

The plaintiff also alleged that the plaintiff's assignor, the New York corporation, duly assigned to the plaintiff all its rights and interests in regard to the subject-matter of the two contracts, and that the plaintiff, at the time of the commencement of the action, was the lawful owner of all such interests and rights, and was entitled to bring the action in its own name.

To this complaint the defendant made answer, denying many of its allegations and setting up certain other agreements which it alleged had been made by the plaintiff and other parties, including defendant, and which, as averred, amounted to a combination of all the manufacturers and dealers in patent harrows, to regulate their manufacture and to provide for their sale and

the prices thereof throughout the United States. It was also in the answer averred that such contracts had been pronounced to be void by the Supreme Court of New York, and the contracts now before the court were, as contended by defendant, but a continuation and a part of the other contracts already declared void, and that these contracts between the parties to this action were also void. It also alleged that all of the various contracts were in violation of the act of Congress, approved July 2, 1890, being chapter 647 of the first session of the Fifty-first Congress, (26 Stat. 209,) entitled "An act to protect trade and commerce against unlawful restraints and monopolies."

The case was referred to a referee to hear and decide, who, after hearing the testimony, reported in favor of the plaintiff. The material portions of his report are as follows:

"That for some time prior to the month of September, 1890, the spring tooth harrow business was conducted by the following-named parties: D. C. & H. C. Reed & Company, of Kalamazoo, Mich.; G. B. Olin & Company, Perry and Canandaigua, N. Y.; Chase, Taylor & Company, W. S. Lawrence, doing business under the name of Lawrence & Chapin, both of Kalamazoo, Mich.; J. M. Childs & Company, of Utica, N. Y.; and A. W. Stevens & Son, of Auburn, N. Y., who began the harrow business in substantially the order named above.

"The first two above-named firms conducted their business in separate portions or territory of the United States, under the same United States letters patent, and the other firms began their business in hostility to the same letters patent. The first two firms began a number of patent lawsuits against the other firms and their customers for infringement of patents. These suits were vigorously prosecuted and the court finally decided the patents valid, and ordered an accounting of profits against the firm of Chase, Taylor & Company, and W. S. Lawrence.

"Prior to September, 1890, the last four of the above-named firms settled their disputes over patents with the first two firms, and took licenses under their letters patent. Considerable sums of money were paid in settlement of these disputes and rights; and prior to said date, September, 1890, there was no other relation between the first two firms named, and the other parties

than that of licensor and licensee under United States letters patent.

"In the year 1890, and just prior thereto, other persons, firms and corporations began the spring tooth harrow business and other patent lawsuits followed: Suits were begun against the defendants herein, and against their customers purchasing their spring tooth harrows; and one case had gone to final decree, in which the defendant was ordered to account for profits and damages; and an injunction had been granted in another suit. Proceedings were pending upon an application for rehearing in these cases.

"In September, 1890, the six firms first above named decided to organize a corporation known as the National Harrow Company of New York, with a view to transferring various United States letters patent owned by the six firms respectively to said corporation, and for the purpose of conducting the manufacture of some part or portion of the material which entered into their spring tooth harrow business.

"In the conduct of the spring tooth harrow business, the harrows came to be known in the market as 'float spring tooth harrows;' that name having been adopted to differentiate the harrows from those known in the market as 'wheel harrows,' which had frame bars and curved spring teeth supported from an axle above, which axle had wheels at either end of the diameter above thirty inches. The two classes of harrows were differentiated, one being called a 'float' and the other a 'wheel' spring tooth harrow. The litigations had been wholly over the 'float' spring tooth harrows.

"The members composing the first six firms, above named, in the harrow business in September, 1890, organized under the laws of the State of New York the 'National Harrow Company.' That corporation was duly legally incorporated, and after its incorporation it received from the said six firms the transfer of their separate United States letters patent, license contracts and privileges under patents. The defendant's president, Arthur O. Bement, became and continued a director of this corporation until its dissolution, which followed in a little over a year.

"This corporation entered into some contracts with spring tooth harrow manufacturers, which were decided by the Supreme Court of the State of New York to be illegal as against public policy, on account of restraints contained in the contracts, which extended beyond the lifetime of the patents. That case is reported in the New York Supplement, vol. 18, page 224. *Strait et al.* v. *National Harrow Company et al.*

"Immediately following this decision, all of the contracts then in existence which were affected thereby were immediately cancelled by the parties to such contracts.

"The defendant, E. Bement & Sons, in the fall of 1890, entered into a contract with the National Harrow Company, looking to the selling of its patents and rights under patents relating to the spring tooth harrow business; but this contract was abandoned, the conditions upon which it was executed not having been complied with, the contract became and was wholly void.

"The defendant had no contract with the National Harrow Company until about June 16 or 17, 1891, at which time several contracts were entered into between the defendant and the National Harrow Company of New York. Among other contracts the defendant executed and delivered assignments in writing of several United States letters patent and license rights and privileges under United States letters patent, all of which related to the defendant's float spring tooth harrow business. Such contracts constituted an absolute sale of the property and privileges thereby transferred, and the defendant agreed to accept in payment thereof the paid-up capital stock of the National Harrow Company of New York, and the value of the rights transferred were, by agreement between the parties fixed and determined by arbitration, under which arbitration the defendant was awarded and the value was fixed at upwards of $29,000. The defendant was dissatisfied with the amount of the award, and such dissatisfaction and difference was afterwards adjusted by an agreement to issue to the defendant and the defendant to accept an additional amount of $16,000 of said capital stock. That by agreement, in the place of the said capital stock of the New York company, the defendant accepted

and agreed to take the stock of the plaintiff in this action, and there has been issued to the defendant and the defendant has received the capital stock of this plaintiff in an amount upwards of $45,000 in payment for the property and rights sold and transferred by the defendant to the National Harrow Company of New York. That said upwards of $45,000 of stock was issued to the president of the defendant for defendant's benefit, and on said stock defendant has received several cash dividends.

" The transaction between the National Harrow Company of New York and this defendant had, in June, 1891, was intended by the parties to be an absolute sale by the defendant to the National Harrow Company of New York of the United States letters patent and licenses under United States letters patent relating to the float spring tooth harrow business conducted by the defendant, and it was founded on a good, valuable and adequate consideration moving between the parties.

" That, as a part of such transaction, the National Harrow Company of New York granted, issued and delivered to the defendant the license contracts A and B, which are attached to the complaint in this action and made a part thereof. Upon the consummation of the transaction in June, 1891, the controversy over patents and infringements existing between the first six firms named above, and the defendant and its customers, was settled. The papers which were executed in June, 1891, were all dated as of April 1, 1891, and were to take effect as of that date. At the date of the execution and delivery of the license contracts A and B, the National Harrow Company of New York was the owner by assignment and purchase of a large number of United States letters patent, which it is claimed fully monopolized and covered the defendant's float spring tooth harrow business.

" The sale by the defendant of its letters patent, and license rights and privileges to the National Harrow Company of New York, and the signing and delivering of license contracts A and B, were intended to and did, settle existing controversies with reference to the rights of the National Harrow Company of New York and the defendant.

" I decide that the contract entered into in June, 1891, includ-
ing the contracts A and B between the National Harrow
Company of New York and this defendant were and are good
and valid contracts, founded on adequate considerations and
were reasonable in their provisions; contracts A and B im-
posing no restraints upon the defendant beyond those which
the parties had a right, from the nature of the transaction, to
impose and accept.

" In July, 1891, a corporation was organized under the laws
of the State of New Jersey, known and designated as the Na-
tional Harrow Company, which corporation is the plaintiff in
this action. None of the parties organizing this corporation
were in the spring tooth harrow business. The New Jersey
corporation was duly and legally organized in conformity with
the laws of that State, and was by those laws and its charter
authorized to purchase United States letters patent and to grant
licenses under United States letters patent and to conduct the
manufacturing business, and had a variety of other rights and
privileges under its charter and said statutes. That this cor-
poration, the plaintiff, still is a legal and valid corporation, en-
titled to hold and enjoy such of its property as it now or may
hereafter own or acquire, and that it was not organized in hos-
tility to any rule of public policy.

" That the National Harrow Company of New Jersey, this
plaintiff, through its duly constituted officers purchased from
the National Harrow Company of New York all of its various
United States letters patent, and all contracts, licenses and
privileges which the National Harrow Company of New York
then owned and possessed, and also purchased a part of its
other property, rights and privileges.

" That on the 9th of September, 1891, a formal transfer in
writing was made from the National Harrow Company of
New York to the National Harrow Company of New Jersey
of the property and rights sold as aforesaid by the former com-
pany to the latter, which transfer was founded on a good, valu-
able and adequate consideration moving between the parties,
and which transfer was sanctioned by the directors and stock-
holders of the New York corporation, and by the officers and

directors of the National Harrow Company of New Jersey, this plaintiff, and separate assignments in writing were made of the various United States letters patent from the New York corporation to the New Jersey corporation.

"I decide that this transfer was in all respects legal and valid, being founded on a good and valuable consideration, and that it vested in the plaintiff in this action all the rights, privileges and benefits accruing to the New York corporation under its contracts with the defendant, including contracts A and B, which contracts have been slightly modified by the parties as to price and terms of sale.

"The defendant's president, Arthur O. Bement, became a director and an active manager of the plaintiff, and continued as such down to September, 1893.

"The defendant made monthly verified reports to this plaintiff down to and including the 8th of September, 1893, of the harrows embraced in contracts A and B, by such reports stating the total harrows sold to be 13,900, on which defendant paid to the plaintiff a royalty of $13,900.

"The National Harrow Company of New York and this plaintiff have performed all of the stipulations and provisions in the contracts entered into between the National Harrow Company of New York and this defendant, including all the provisions of contracts A and B, and the plaintiff is now ready, willing and able to perform all of the stipulations and agreements to be performed on its part, as assignee of the National Harrow Company of New York.

"That the defendant, after having received and retained large pecuniary benefits under the contracts, has failed, neglected and refused, and still fails, neglects and refuses to keep and perform its contracts entered into, including the stipulations and provisions contained in contracts A and B, and since September, 1893, it has wholly repudiated contracts A and B, and refused to perform any of the stipulations contained therein which it agreed to do and perform, and it has broken and violated all of the stipulations and agreements contained in contracts A and B which it agreed to do and perform."

The referee then states with some detail the various viola-

tions of the license agreements by the defendant, and finds the defendant indebted to the plaintiff in the sum of over twenty thousand dollars. He then continues as follows:

"I decide that the plaintiff is a legal and valid corporation authorized to enforce its rights in courts having jurisdiction, and that all of the contracts in evidence were and are legal, valid and binding contracts, such as might reasonably be made under the circumstances, founded upon an adequate considera- tion, and that they embodied no illegal restraints, and are not repugnant to any rule of public policy as in restraint of trade, or tending to create a monopoly, trust or any other illegal com- bination ; and that the contracts entered into between the de- fendant and the National Harrow Company of New York, including contracts A and B, are and were intended to be con- tinuing contracts, and should be enforced according to their true intent and meaning as hereby interpreted."

The referee then held the plaintiff entitled to a judgment against the defendant, declaring the validity of the plaintiff cor- poration and its title to the contracts and their validity, and de- creeing specific performance thereof and restraining future viola- tions of the contracts by the defendant. Judgment in accordance with the report was entered, from which the defendant appealed to the appellate division of the Supreme Court.

Some difficulties regarding the form in which the case was presented to that court arose upon the argument, and it was therefore suspended and the case sent back to the referee for a resettlement, which was subsequently agreed upon by counsel for the respective parties, who entered into a stipulation in re- gard to what was to be reviewed by the courts above, and, among other things, it was agreed between counsel: "That the foregoing record, as amended and corrected in this stipula- tion, contains all of the evidence given and proceedings had before the referee material to the questions to be raised on this appeal by the appellant, which questions to be raised by the appellant on this appeal are to be only as follows." Those questions are eight in number, the fourth of which is: "Whether or not the contracts A and B are valid under the act of Congress approved July 2, 1890, chapter 647 of the first

session of the Fifty-first Congress." This is the only Federal question raised and appearing in the record.

The case was thereupon argued before the appellate division, which reversed the judgment, and ordered a new trial, but it did not state in its order of reversal that the judgment was reversed on questions of fact as well as of law. The plaintiff then appealed to the Court of Appeals from the order granting a new trial, and after argument it was held by that court that it had no jurisdiction to review the facts, and that upon the findings of the referee there had been no error of law committed, and consequently the Supreme Court was wrong in reversing the judgment. The court therefore reversed the judgment of the Supreme Court, and affirmed the judgment entered upon the report of the referee.

*Mr. Clark C. Wood, Mr. Edward Cahill* and *Mr. Henry J. Cookingham* for plaintiff in error.

*Mr. Edwin H. Risley* for defendant in error.

Mr. Justice Peckham, after making the foregoing statement of facts, delivered the opinion of the court.

In this court we are concluded by the findings of fact made in a state court in a suit in equity, as well as in an action at law. *Dower* v. *Richards,* 151 U. S. 658, 666; *Israel* v. *Arthur,* 152 U. S. 355; *Egan* v. *Hart,* 165 U. S. 188; *Hedrick* v. *Atchison, Topeka & Santa Fé Railroad Company,* 167 U. S. 673, 677.

The only Federal question raised in the record is as to the validity of contracts A and B, with regard to the act of Congress on the subject of trusts. Act of July 2, 1890, c. 647, 26 Stat. 209. That is a question of law, plainly raised in the record, and we are not precluded from its consideration by any action of the state courts. If, however, facts not found by the referee are necessary for the purpose of connecting those contracts with others not found in such report, we cannot supply the omission to find those facts. The contention of the defendant is that

the two contracts A and B are in truth a part and continuation
of the agreements set forth in the defendant's answer, and that
taken together they prove a purpose and combination on the
part of all the dealers in patented harrows to control their man-
ufacture, sale and price in all portions of the United States, and
defendant avers that such a contract or combination was and is
void, not only as against public policy, but also because it is a
violation of the Federal statute upon the subject of trusts and
illegal combinations. Those former alleged contracts are not
mentioned in the report of the referee excepting, as he stated,
they had been declared void as against public policy, and as
being in restraint of trade because they extended beyond the
life of the patents therein mentioned, and the referee found that
following this decision all of the contracts then in existence,
which were affected thereby, were immediately cancelled by
the parties thereto.

The referee made no finding of any fact connecting the contracts
A and B with prior contracts of a like nature including other
parties, as alleged in the answer of the defendant. The referee
did find, however, that the defendant had no contract with the
National Harrow Company until June 16 or 17, 1891, at which
time several contracts were entered into between the plaintiff
and the National Harrow Company of New York, and among
other contracts the plaintiff executed and delivered assignments
in writing of several United States letters patent and license
rights and privileges under United States letters patent, all of
which relate to the defendant's float spring tooth harrow business.
He also found that such contracts constituted an absolute sale
of the property and privileges thereby transferred, and that the
defendant agreed to and did accept in payment thereof paid up
capital stock of the plaintiff. He further found that the trans-
action between the assignor of the plaintiff and the defendant
in June, 1891, was intended by the parties to be an absolute
sale by the defendant to such assignor of the United States let-
ters patent and licenses under such patents relating to the float
spring tooth harrow business conducted by the defendant, and
that it was founded upon a good, valuable and adequate con-
sideration between the parties; that as a part of such consider-

ation the assignor of the plaintiff granted and delivered to the defendant the license contracts A and B, heretofore spoken of, and that upon the consummation of the transaction the controversy over patents and infringements existing between the first six firms named in the referee's report and the defendant and its customers was settled. The report also decided " that the contract entered into in June, 1891, including the contracts A and B between the National Harrow Company of New York and this defendant were and are good and valid contracts, founded on adequate considerations and were reasonable in their provisions; contracts A and B imposing no restraints upon the defendant beyond those which the parties had a right, from the nature of the transaction, to impose and accept."

The omission of the referee to find from the evidence that the contracts A and B were a continuation of former contracts held to have been void, and that there were in fact other manufacturers of harrows who had entered into the same kind of contracts with plaintiff as those denominated A and B, and that there was a general combination among the dealers in patented harrows to regulate the sale and prices of such harrows, furnishes no ground for this court to assume such facts. The contracts A and B are to be judged by their own contents alone and construed accordingly.

The referee also decided that the plaintiff was a legal and valid corporation, authorized to enforce its rights in courts having jurisdiction, and that all the contracts in evidence were and are legal, valid and binding contracts, and such as might reasonably be made under the circumstances, and were founded upon a good, valuable and adequate consideration, and were reasonable in their provisions, and that they embodied no illegal restraints, and were not repugnant to any rule of public policy as in restraint of trade, and were not intended to create a monopoly, trust or illegal combination, and that the contracts entered into between the defendant and the National Harrow Company of New York, including the contracts A and B, are, and were, intended to be continuing contracts, and should be enforced according to their true intent and meaning as hereby interpreted.

When he speaks of all the contracts in evidence, the referee

plainly means all the contracts in evidence between the parties to this action, for it was of such contracts only that he had been speaking. There were, in fact, other contracts than those designated A and B between these parties, and such other contracts had been put in evidence, and previously referred to by the referee. He, therefore, must have included what is termed the escrow agreement in his finding, that all the agreements made by defendant with the plaintiffs were valid. That agreement is set forth in the margin.[1]

---

[1] "*Escrow Agreement.*

"This memoranda of agreement, made and entered into this 1st day of April, A. D. 1891, by and between the National Harrow Company, a corporation of Utica, in the State of New York, and Edward Norris of the same place; and E. Bement & Sons of Lansing, in the State of Michigan.

"Whereas, the said National Harrow Company is the owner of a large number of latters patent relating to float spring tooth harrows, and is desirous of granting licenses thereunder to the following-named persons, firms and corporations, to wit: Chas. H. Childs & Company, D. B. Smith & Company, A. W. Stevens & Son, Childs & Jones, Syracuse Chilled Plow Company, Geo. W. Sweet & Company, Walker Manufacturing Company, Taylor & Henry, the Herndeen Manufacturing Company, D. C. & H. C. Reed & Company, L. C. Lull & Company, Williams Manufacturing Company, W. S. Lawrence, McSherry Manufacturing Company, D. O. Everst & Company, E. Bement & Sons, Hench & Dromgold, Farmers' Friend Manufacturing Company, Eureka Mower Company.

"And whereas, the said National Harrow Company has placed in the hands of said E. Norris in escrow, duly executed by it in duplicate, a certain contract and license for each of said persons, firms and corporations hereinbefore named, to be by the said E. Norris immediately presented to each of the above and foregoing named respective persons, firms and corporations, to be signed and executed by said respective persons, firms and corporations—

"Now, therefore, it is hereby understood and agreed by and between the parties hereto, that as the said licenses and contracts are signed and executed by the said respective persons, firms and corporations, they shall be held by said Norris, in escrow, for both parties until such time as all of said above-named persons, firms and corporations shall have signed, executed and delivered the same to said Norris, whereupon they shall become operative, and immediately thereafter the said Norris shall deliver one of the duplicates of each of said contracts and licenses to the said National Harrow Company and the other duplicate thereof to the respective licensees who have signed the same, in person or by mail.

"But in case any of the above-named persons, firms and corporations

Opinion of the Court.

There is no finding by the referee that this agreement was ever signed by any one other than the parties to this action, or that any other person received the licenses from and made contracts with the plaintiff similar to the ones entered into between these parties. All that the referee finds is, that all. the contracts in evidence were legal, by which was meant, as already stated, all the contracts in evidence between the parties to the action, which were in existence and uncancelled. In the absence of any finding as to the escrow agreement having been signed by others, it must be regarded as unimportant, and we are brought back to the question whether these contracts or licenses, A and B, irrespective of any contracts not found by the referee as in any way connected with, or forming a part thereof, are void as a violation of the act of Congress.

The plaintiff contends in the first place that only the Attorney General of the United States can bring an action under the statute, excepting that by section 7 of the act any person injured in his business or property, as provided for therein, may himself sue in any Circuit Court of the United States, in the district in

---

shall neglect or refuse to sign, execute and deliver said respective contracts and licenses on or before the 1st day of June next, then and in such case said E. Norris shall, provided he shall be so directed, by a resolution duly adopted by the board of trustees of said National Harrow Company, make delivery of such of said contracts and licenses as have been signed and executed as above provided, at which time said contracts and licenses shall become operative, and in case the said National Harrow Company shall conclude not to accept any less number than the whole of such respective contracts and licenses, then and in such case the said Norris shall cancel each of said contracts and licenses, and they shall be null and void.

"Witness the signatures of the parties.

"THE NATIONAL HARROW CO.,
By CHAS. H. CHILDS, *Pres't.*
"EDWARD NORRIS.
"E. BEMENT & SONS,
By A. O. BEMENT, *Pres't.*

"Received of E. Bement & Sons a license and contract executed between the National Harrow Company and said E. Bement & Sons, which I agree to hold and deliver in accordance with an agreement between the said National Harrow Company and said E. Bement & Sons and myself, and hereto attached.

"Dated this 1st day of April, 1891.     EDWARD NORRIS."

which the defendant resides or is found. Assuming that the plaintiff is right so far as regards any suit brought under that act, we are nevertheless of opinion that any one sued upon a contract may set up as a defence that it is a violation of the act of Congress, and if found to be so, that fact will constitute a good defence to the action.

The first section of the act provides that "every contract, combination in the form of trust, or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal." Every person making such a contract is deemed guilty of a misdemeanor, and on conviction is to be punished by fine or by imprisonment, or both. As the statute makes the contract in itself illegal, no recovery can be had upon it when the defence of illegality is shown to the court. The act provides for the prevention of violations thereof, and makes it the duty of the several district attorneys, under the direction of the Attorney General, to institute proceedings in equity to prevent and restrain such violations, and it gives to any person injured in his business or property the right to sue, but that does not prevent a private individual when sued upon a contract which is void as in violation of the act from setting it up as a defence, and we think when proved it is a valid defence to any claim made under a contract thus denounced as illegal.

This brings us to a consideration of the terms of the license contracts for the purpose of determining whether they violate the act of Congress. The first important and most material fact in considering this question is that the agreements concern articles protected by letters patent of the Government of the United States. The plaintiff, according to the finding of the referee, was at the time when these licenses were executed the absolute owner of the letters patent relating to the float spring tooth harrow business. It was, therefore, the owner of a monopoly recognized by the Constitution and by the statutes of Congress. An owner of a patent has the right to sell it or to keep it; to manufacture the article himself or to license others to manufacture it; to sell such article himself or to authorize

others to sell it. As stated by Mr. Justice Nelson, in *Wilson v. Rousseau*, 4 How. 646, 674, in speaking of a patent:

"The law has thus impressed upon it all the qualities and characteristics of property for the specified period; and has enabled him to hold and deal with it the same as in the case of any other description of property belonging to him, and on his death it passes, with his personal estate, to his legal representatives, and becomes part of the assets."

Again, as stated by Mr. Chief Justice Marshall, in *Grant v. Raymond*, 6 Pet. 218, 241:

"To promote the progress of useful arts, is the interest and policy of every enlightened government. It entered into the views of the framers of our Constitution, and the power 'to promote the progress of science and useful arts, by securing for limited times to authors and inventors, the exclusive right to their respective writings and discoveries,' is among those expressly given to Congress. This subject was among the first which followed the organization of our Government. It was taken up by the first Congress at its second session, and an act was passed authorizing a patent to be issued to the inventor of any useful art, etc., on his petition, 'granting to such petitioner, his heirs, administrators or assigns, for any term not exceeding fourteen years, the sole and exclusive right and liberty of making, using and vending to others to be used, the said invention or discovery.' The law further declares that the patent 'shall be good and available to the grantee or grantees by force of this act, to all and every intent and purpose herein contained.' The amendatory act of 1793 contains the same language, and it cannot be doubted that the settled purpose of the United States has ever been, and continues to be, to confer on the authors of useful inventions an exclusive right to their inventions for the time mentioned in their patent. It is the reward stipulated for the advantages derived by the public for the exertions of the individual, and is intended as a stimulus to those exertions. The laws which are passed to give effect to this purpose ought, we think, to be construed in the spirit in which they have been made; and to execute the contract fairly on the part of the United States, where the full benefit has been actually received:

if this can be done without transcending the intention of the statute, or countenancing acts which are fraudulent or may prove mischievous. The public yields nothing which it has not agreed to yield; it receives all which it has contracted to receive. The full benefit of the discovery, after its enjoyment by the discoverer for fourteen years, is preserved; and for his exclusive enjoyment of it during that time the public faith is pledged."

In *Heaton-Peninsular Company* v. *Eureka Specialty Company*, 47 U. S. App. 146, 160, it is stated regarding a patentee:

" If he see fit, he may reserve to himself the exclusive use of his invention or discovery. If he will neither use his device nor permit others to use it, he has but suppressed his own. That the grant is made upon the reasonable expectation that he will either put his invention to practical use or permit others to avail themselves of it upon reasonable terms, is doubtless true. This expectation is based alone upon the supposition that the patentee's interest will induce him to use, or let others use, his invention. The public has retained no other security to enforce such expectations. A suppression can endure but for the life of the patent, and the disclosure he has made will enable all to enjoy the fruit of his genius. His title is exclusive, and so clearly within the constitutional provisions in respect of private property that he is neither bound to use his discovery himself nor permit others to use it. The *dictum* found in *Hoe* v. *Knap*, 17 Fed. Rep. 204, is not supported by reason or authority."

It is true that in certain circumstances the sale of articles manufactured under letters patent may be prevented when the use of such article may be subject, within the several States, to the control which they may respectively impose in the legitimate exercise of their powers over their purely domestic affairs, whether of internal commerce or of police regulation. Thus an improvement for burning oil, protected by letters patent of the United States, was condemned by the state inspector of Kentucky as unsafe for illuminating purposes under the statute requiring an inspection and imposing a penalty for

the violation of the statute, and it was held that the enforcement of the statute was within the proper police powers of the State, and that it interfered with no right conferred by the letters patent. *Patterson* v. *Kentucky*, 97 U. S. 501.

There are decisions also in regard to telephone companies operating under licenses from patentees giving them the right to use their patents for the purpose of operating public telephone lines, but prohibiting companies from serving within such district any telephone company, and it has been held in the lower Federal courts that such a prohibition was of no force; that it was inconsistent with the grant, because a telephone company, being in the nature of a common carrier, was bound to render an equal service to all who applied and tendered the compensation fixed by law for the service; that while the patentees were under no obligation to license the use of their inventions by any public telephone company, yet, having done so, they were not at liberty to place restraints upon such a public corporation which would disable it to discharge all the duties imposed upon companies engaged in the discharge of duties subject to regulation by law. It could not be a public telephone company and could not exercise the franchise of a common carrier of messages with such exceptions to the grant. See *Missouri ex rel. &c.* v. *Bell Telephone Company*, 23 Fed. Rep. 539; *State ex rel. &c.* v. *Delaware &c. Company*, 47 Fed. Rep. 683; and *Delaware & Atlantic &c. Company* v. *Delaware ex rel. &c.*, 3 U. S. App. 30.

These cases are cited in the opinion of the court in the case of *Heaton-Peninsular Company* v. *Eureka Specialty Company*, *supra*. Notwithstanding these exceptions, the general rule is absolute freedom in the use or sale of rights under the patent laws of the United States. The very object of these laws is monopoly, and the rule is, with few exceptions, that any conditions which are not in their very nature illegal with regard to this kind of property, imposed by the patentee and agreed to by the licensee for the right to manufacture or use or sell the article, will be upheld by the courts. The fact that the conditions in the contracts keep up the monopoly or fix prices does not render them illegal.

The contention that they do not affect interstate commerce, is not correct. We think the licenses do by their terms and by their plain meaning refer to, include and provide for interstate as well as other commerce. The contract called Exhibit B provides for the manufacture at Lansing, Michigan, and for the sale of the articles there made in territory lying south and west of Virginia and West Virginia and Pennsylvania, and the referee finds that a number of harrows have been sold under that contract. The contracts plainly look to the sale, and they also determine the price of the article sold, throughout the United States, as well as to the manufacture in the State of Michigan. As these contracts do, therefore, include interstate commerce within their provisions, we are brought back to the question whether the agreement between these parties with relation to these patented articles is valid within the act of Congress. It is true that it has been held by this court that the act included any restraint of commerce, whether reasonable or unreasonable. *United States* v. *Trans-Missouri Freight Association*, 166 U. S. 290 ; *United States* v. *Joint Traffic Association*, 171 U. S. 505 ; *Addystone Pipe &c. Company* v. *United States*, 175 U. S. 211. But that statute clearly does not refer to that kind of a restraint of interstate commerce which may arise from reasonable and legal conditions imposed upon the assignee or licensee of a patent by the owner thereof, restricting the terms upon which the article may be used and the price to be demanded therefor. Such a construction of the act we have no doubt was never contemplated by its framers.

*United States* v. *E. C. Knight Company*, 156 U. S. 1, does not bear upon the facts herein. That case related to a purchase of stock in manufacturing companies, by reason of which the purchaser secured control of a large majority of the manufactories of refined sugar in the United States. It was held by this court that the Federal act relating to trusts and combinations affecting interstate commerce could not reach and suppress the creation of a monopoly in regard to the refining of sugar, and that the manufacturing of a commodity bore no direct relation to commerce between the States or with foreign nations. It was said by Mr. Chief Justice Fuller, for the court, while

speaking of such manufacture: "Nevertheless it does not follow that an attempt to monopolize, or the actual monopoly of, the manufacture was an attempt, whether executory or consummated, to monopolize commerce, even though, in order to dispose of the product, the instrumentality of commerce was necessarily invoked."

In these contracts provision is expressly made, not alone for manufacture, but for the sale of the manufactured product throughout the United States, and at prices which are particularly stated, and which the seller is not at liberty to decrease without the assent of the licensor. *Addystone Pipe & Steel Company* v. *United States*, 175 U. S. 211, 238. These contracts directly affected, not as a mere incident of manufacture, the sale of the implements all over the country, and the question arising is whether the contracts which thus affect such sales are void under the act of Congress.

On looking through these licenses we have been unable to find any conditions contained therein rendering the agreement void because of a violation of that act. There had been, as the referee finds, a large amount of litigation between the many parties claiming to own various patents covering these implements. Suits for infringements and for injunction had been frequent, and it was desirable to prevent them in the future. This execution of these contracts did in fact settle a large amount of litigation regarding the validity of many patents as found by the referee. This was a legitimate and desirable result in itself. The provision in regard to the price at which the licensee would sell the article manufactured under the license was also an appropriate and reasonable condition. It tended to keep up the price of the implements manufactured and sold, but that was only recognizing the nature of the property dealt in, and providing for its value so far as possible. This the parties were legally entitled to do. The owner of a patented article can, of course, charge such price as he may choose, and the owner of a patent may assign it or sell the right to manufacture and sell the article patented upon the condition that the assignee shall charge a certain amount for such article.

It is also objected that the agreement of the defendant not

to manufacture or sell any other float spring tooth harrow, etc., than those which it had made under its patents before assigning them to the plaintiff, or which it was licensed to manufacture and make, under the terms of the license, except such other style and construction as it may be licensed to manufacture and sell by the plaintiff, is void under the act of Congress.

The plain purpose of the provision was to prevent the defendant from infringing upon the rights of others under other patents, and it had no purpose to stifle competition in the harrow business more than the patent provided for, nor was its purpose to prevent the licensee from attempting to make any improvement in harrows. It was a reasonable prohibition for the defendant, who would thus be excluded from making such harrows as were made by others who were engaged in manufacturing and selling other machines under other patents. It would be unreasonable to so construe the provision as to prevent defendant from using any letters patent legally obtained by it and not infringing patents owned by others. This was neither its purpose nor its meaning.

There is nothing which violates the act in the agreement that plaintiff would not license any other person than the defendant to manufacture or sell any harrow of the peculiar style and construction then used or sold by the defendant. It is a proper provision for the protection of the individual who is the licensee, and is nothing more in effect than an assignment or sale of the exclusive right to manufacture and vend the article. In brief, after a careful examination of these contracts, we are unable to find any provision in them, either taken separately or in connection with all the others therein contained, which would render the contracts between these parties void as in violation of the act of Congress.

It must, however, be conceded that the escrow agreement above set forth looks to the signing, by the parties mentioned therein, of contracts similar to those between the parties to this suit, designated A and B, and containing like conditions relating to the patents respectively, owned by such parties. But there is no finding by the referee that such contracts were in fact entered into by those other parties nor that they con-

stituted a combination of most, if not all, of the persons or corporations engaged in the business concerning which the agreements between the parties to this suit were made. If such similar agreements had been made, and if, when executed, they would have formed an illegal combination within the act of Congress, we cannot presume for the purpose of reversing this judgment, in the absence of any finding to that effect, that they were made and became effective as an illegal combination. As between these parties, we hold that the agreements A and B actually entered into were not a violation of the act. We are not called upon to express an opinion upon a state of facts not found. Upon the facts found there is no error in the judgment of the Court of Appeals, and it must, therefore, be

*Affirmed.*

Mr. Justice Harlan, Mr. Justice Gray and Mr. Justice White did not hear the argument and took no part in the decision of this case.