## STRAIGHT SIDE BASKET CORPORATION v. WEBSTER BASKET CO.
### No. 744.

District Court, W. D. New York.

March 5, 1935.

Bean & Brooks, of Buffalo, N. Y., for plaintiff.

172

Dwyer, Reilly, Roberts, McLouth & Dicker, of Rochester, N. Y., for defendant.

KNIGHT, District Judge.

This is an action at law brought to recover on two separate causes of action. In one, the plaintiff seeks to recover royalties in the sum of $2,199.99 on account of certain license contracts referred to as Straight Side license contracts, and, in the other, plaintiff seeks to recover royalties on a certain license contract referred to herein as the E. Z. Pak contract, in the sum of $3,375.

The facts out of which it is claimed these separate alleged causes of action arose are distinctly dissimilar and require separate discussion.

The answer to the alleged cause of action on the so-called Straight Side license contracts contains a general denial, an affirmative defense and counterclaim, and a further affirmative defense that such contracts "constitute a price fixing arrangement, which is in restraint of trade, contrary to public policy and void." It also is asserted as an affirmative defense and counterclaim that the license contracts require plaintiff to prosecute infringers with due diligence, that plaintiff failed so to do, and that defendant suffered damages by reason thereof.

An orderly consideration of the issues requires determination, first, of the issue raised by the affirmative defense as regards the illegality of these license contracts. If this issue is decided in defendant's favor, the defendant could not recover on its counterclaim. No fraud is alleged. The defendant, therefore, could not recover anything resulting from its own illegal act.

Heretofore a motion was made by the plaintiff to strike out the aforesaid affirmative defense of illegality as insufficient in law. I denied the motion. 4 F. Supp. 644. It is not necessary to repeat the reasoning upon which the court based such denial. It was based upon the pleadings under the necessary assumption that they stated the facts.

The plaintiff was the owner of certain patented apparatus or devices, and in May, 1930, entered into five several patent license agreements with defendant, whereby it authorized the defendant to use these patented devices in the making of so-called "straight side bent bottom baskets." Defendant agreed to pay a certain royalty for the use thereof. No question is raised as regards the amount of royalties unpaid.

In my decision upon the motion aforesaid I stated: "Taking the license agreement, bulletins, and authorized dealers contracts together as binding upon the parties to this action, the fact is that licensor controls the prices at which the baskets are to be sold, both by the licensee and by the authorized dealer."

Here we have what are called "license agreements" between the plaintiff and the defendant, certain bulletins of prices sent out from time to time by the plaintiff, and also so-called authorized dealers contracts. The necessary assumption from the language of the affirmative defense, alleging illegality, is that the so-called "authorized dealers contract" is claimed to be a part of the license agreement. Indeed, that is defendant's explicit contention now. For the reasons given in my prior opinion, and upon the authorities there cited, I entertain no doubt that, if the authorized dealers contract was a part of the license agreement, the license contracts are in restraint of trade and void. There has been left for determination whether that is the fact.

No reference is found in the license agreement contracts to any authorized dealers agreement or any provisions looking to the purpose to attempt to limit the price of sales by any so-called authorized dealers. The only terms of the license agreement on which can be predicated the claim that the authorized dealers agreement became a part of the original license agreement is found in section 24 of the license agreement, which reads: "Licensee agrees not to give away any of these baskets made under this license agreement, except the sample; nor to sell any such baskets for less than the fair market price thereon; and on such terms and conditions as licensor may from time to time decide are just and equitable."

The presumption of legality rather than illegality must be drawn. The plaintiff had the right to fix the price at which defendant might sell the product of the patented devices. United States v. General Electric Co., 272 U. S. 476, 47 S. Ct. 192, 71 L. Ed. 362; Standard Sanitary Mfg. Co. v. United States, 226 U. S. 20, 33 S. Ct. 9, 57 L. Ed. 107; E. Bement & Sons v. National Harrow Co., 186 U. S. 70, 22 S. Ct. 747, 46 L. Ed. 1058; National Phonograph Co. v. Schlegel et al. (C. C. A.) 128 F. 733. This is far from saying that it could enter into a tri-party agreement fixing a minimum price at which the product made by the plaintiff's devices could be sold by the pur-

chasers from defendant. The presumption is that section 24 contemplated the license agreement conditioned on terms which were legal. It is the contention of the defendant that this particular section 24 includes by reference all subsequent instructions issued concerning "the price, terms and conditions of all sales of baskets." No authorized dealers agreement was executed at the time the contract between the licensor and licensee was made. Some time subsequent to the execution of the license agreement, the plaintiff sent the defendant certain so-called bulletins purporting to state prices at which straight-side bent bottom baskets were to be sold in certain territories and had certain correspondence with the defendant relative to the definition of "dealers." There was no reference to authorized dealers in such communications until August 30, 1930, when plaintiff wrote to the defendant stating that it inclosed Bulletin No. 18, containing terms and conditions to apply under the license contract. This letter also adds: "We also enclose copy of authorized dealers contract," and recites when it was to become effective. Until that date, there is nothing to show any intention on the part of the plaintiff to make any arrangement for the sale of these baskets through so-called authorized dealers. Certain of the plaintiff's bulletins named prices with discounts to "dealers," but there is no reference to "authorized dealers contract" such as was submitted on August 29, 1930, and in a letter of August 7, 1930, the plaintiff states: "The problem of dealers has been a stumbling block in nearly all industries," and in a letter of August 23, 1930, it is said in effect that the new plan would be ready in a week—it would be a stepping stone—probably not perfect.

The authorized dealers form of contract provides for its execution by the licensee as well as the dealer. Plaintiff sent one of these forms of agreement to the defendant. It was never signed by the defendant. There was never any communication from the defendant stating or purporting to show its acquiescence in the proposed authorized dealers contract.

The communication of August 30, 1930, to the defendant recites the inclosure of copies of the bulletin (authorized dealers contract) concerning which it states that one is to be retained by it and the other to be accepted by it and sent back to the plaintiff by return mail, "so that you (defendant) may enjoy the advantage of this new plan." This indicated the requirement of an acceptance. Nothing was thereafter done by defendant in any way showing an acceptance. Further, the defendant never entered into any authorized dealers contracts with authorized dealers. As a matter of fact, no executed authorized dealers contract is in evidence.

As stated by defendant, the question to be determined here is whether the language of section 24 is broad enough to include within its scope instructions concerning price, terms, and conditions, such as were contained in Bulletin No. 18, which included a copy of the proposed authorized dealers contract.

■ What was said by this court on the motion hereinbefore referred to with reference to whether the authorized dealers contract was a part of the license agreement, or whether it was collateral, was said with reference to the pleadings, and left for determination upon the trial the question as to whether the authorized dealers contract was part of the license agreement. It is my conclusion that the authorized dealers contract was not within the contemplation of the provisions of section 24 of the license agreement and that such license agreements are valid and legal.

The plaintiff contends that the authorized dealers contracts, when construed as a part of the original license contract, are valid. I have already held to the contrary in my prior opinion, and my views in that respect are therein fully set forth. I adhere to that opinion and base the decision herein upon the fact that the authorized dealers agreement was not within the contemplation of, or a part of, the license agreement contracts.

■ It is necessary now to consider the question of the defendant's counterclaim. Section 27 of the contract provides: "The licensor shall use due diligence in prosecuting infringements of the patents; if the patents be declared invalid in any court of last resort in any circuit, unless licensor shall institute suit against the infringer in another circuit and carry it to a finality, licensor shall be held to be lacking in due diligence within the meaning of this clause." It is not claimed that any patents in question have been declared invalid in any court. It was incumbent upon the defendant to show that there were infringers. This is sufficiently established by the admissions of the plaintiff in numerous communications to defendant and other licensees and by the further fact

that actions for infringements were brought by the plaintiff. It is my opinion that the plaintiff used due diligence in prosecuting infringers. The license agreements were executed in May, 1930. This suit was brought in April, 1932. Intervening these periods of time, as is clearly shown by the communications, to which reference has been made, and other evidence in the case, the plaintiff was making continuous efforts to prevent infringements. As early as June, 1930, suits against alleged infringers were in process of preparation. Actions were brought against four different companies in four several states, and these have been prosecuted with reasonable diligence. Notice of alleged infringements were sent to other manufacturers, and thereafter licenses under plaintiff's patents were issued to these. Laches is a relative term. It is to be applied with reference to the particular facts in each separate case. I do not see how it can be said on this record that plaintiff has been guilty of laches. All reasonable diligence seems to have been exercised. The counterclaim is dismissed. It is unnecessary, therefore, to consider the question of damages as set forth therein.

■ There remains to be considered the second alleged cause of action arising out of the so-called "E. Z. Pak" contract. The only question here seems to be the question of the amount which the plaintiff is entitled to recover. Nothing was paid on this contract for the years 1930 and 1931, and the sum of $750 only was paid for the year 1929. The agreement provided for cancellation after 30 days on failure to pay the royalty provided in said agreement. It also provided that the licensee might terminate the contract on 30 days' notice. It also gave the plaintiff the option, in the event that the sale of E. Z. Pak baskets proved unsuccessful, to refund the installation charge of machines, or allow licensee to use machines without further royalty, in the event, however, that the licensee was forced to cancel contract by reason of competition.

Under date of March 19, 1929, the defendant wrote E. Z. Pak Corporation that the only way they could continue manufacturing E. Z. Pak baskets would be to do so and pay a royalty on the baskets actually sold in New York state. The minimum royalty per annum fixed by the contract was $1,500. In this letter, defendant states that it did not think the sales would amount to royalties of $750 in the aggregate, and also says: "We would rather throw up the contract entirely than to try and sell in New York State alone." Plaintiff answered this letter under date of March 29, in which they make a counter proposition that they authorized a reduction of defendant's royalty to $500 per year, with the understanding that defendant was not to go outside of New York and New England. This letter also asks for an answer. Under date of April 24, 1929, defendant replied, but said nothing in respect to the acceptance of the modification of the royalty.

Again on June 5, 1929, defendant wrote the E. Z. Pak Corporation that it was doing no business with the E. Z. Pak baskets, but again made no reply to plaintiff's proposition. Defendant continued to make E. Z. Pak baskets, as is shown by its letter under date of December 3, 1929. Under date of October 23, 1929, plaintiff, which in the meantime had taken over E. Z. Pak Corporation, wrote defendant, stating that there was an old balance of $375 against the defendant. To this defendant replied it owed no royalties. Defendant then made no claim for overpayment, but under date of December 16, 1929, wrote plaintiff that defendant had overpaid $250. This letter promptly brought a specific reply from the plaintiff that there had not been any acceptance or any modification of the original contract. Plaintiff also subsequently made different proposals for modification of royalties for 1930 and 1931, but the record discloses that none of these were accepted by the defendant. The correspondence shows that plaintiff recognized the reasonableness of the defendant's requests for modification of the contract. All that was necessary for defendant to do was to state the acceptance. This it did not do. It is my opinion that the evidence shows that the original contract between E. Z. Pak and defendant was at no time modified, changed, or terminated.

Plaintiff is entitled to recover $2,199.99 on account of the license contract referred to herein as straight side license contract, together with interest thereon from the time such royalties became payable, and also entitled to recover $3,375 on account of royalties unpaid for the years 1929, 1930, and 1931 upon the so-called E. Z. Pak contract, together with interest thereon from the time when such royalties became due.

Findings of fact and conclusions of law may be submitted and are to be considered part of this opinion.