## WALTHAM WATCH CO. v. KEENE.

(District Court, S. D. New York. February 15, 1913.)

1. Patents (§ 257*)—Infringement—Sale of Article by Patentee—Right to Fix Price for Resale.

The manufacturer of an article of merchandise, essential parts of which are covered by patents owned by him, who sells such article to the trade and receives the full consideration therefor, including his royalty or compensation for the use of the patented inventions, and who is in no event to receive any further sum therefrom, has received in full the benefit of the monopoly given him by the patent law, and it is not within his right to attach to the contract of sale a condition fixing the price at which the article shall be sold to users, to bind the purchaser so as to make a violation thereof an infringement of the patents.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 257.*]

2. Contracts (§ 116*)—Sale of Article by Patentee—Right to Fix Price for Resale.

Such a restriction is one not reasonably necessary to protect any rights of the patentee and one in which he has no direct pecuniary interest,

---

*For other cases see same topic & § number in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

202 F.—15

but is an attempt to monopolize and to control prices, and is void as in contravention of a sound public policy.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 542–552; Dec. Dig. § 116.*]

3. PATENTS (§ 216*)—INFRINGEMENT—SALE OF ARTICLE BY PATENTEE—RIGHT TO FIX PRICE FOR RESALE.

Such a sale is not made a conditional one which the law will recognize as such by a further provision of the contract purporting to give the seller the right to retake the article, in case it is resold at less than the price fixed, on repayment to the purchaser of the sum paid therefor.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 329; Dec. Dig. § 216.*]

4. STATUTES (§§ 174, 175*)—CONSTRUCTION OF PATENT STATUTES—CONSIDERATIONS OF PUBLIC POLICY.

For the purpose of determining the construction, although not the validity, of a statute, recourse may be had to considerations of public policy, and a purpose to disregard a sound and settled public policy by the enactment of the patent law should not be attributed to Congress except on the most cogent evidence.

[Ed. Note.—For other cases, see Statutes, Cent. Dig. § 254; Dec. Dig. §§ 174, 175.*]

In Equity. Suit by the Waltham Watch Company against Charles A. Keene. On final hearing. Decree for defendant.

For prior opinion, see 191 Fed. 855.

Suit in equity to restrain alleged infringement of certain letters patent; the alleged infringement consisting of the violation of a certain so-called license agreement or restriction as to the resale of watch movements, and which fixes the *price* at which such movements shall be sold by dealers.

Crawford, Harris & Goodwin, of New York City (Matthews, Thompson & Spring, of Boston, Mass., of counsel), for complainant.

Adolph Hirsch Rosenfeld, of New York City, for defendant.

RAY, District Judge. The parties by stipulation have agreed upon the facts, which in condensed form may be stated as follows:

I. The Waltham Watch Company is a corporation of the state of Massachusetts having its place of manufacture of watch movements, etc., and its principal place of business at Waltham in that state, and the defendant, Charles A. Keene, is a citizen of the state of New York, engaged in the business of buying and selling watches and watch movements, etc., in the city of New York, state of New York.

II. The complainant is the sole owner of United States letters patent No. 527,771, to one Church for improvement in watch movement frames, United States letters patent No. 677,689, to one Ohlson, assignor to the Waltham Watch Company, for improvement in spring barrels for watch movements, and United States letters patent No. 556,303, to one Church for improvement in dial holders for watch movements, and has been since May 15, 1906. The said letters patents are good and valid, and the several inventions set forth in said letters patents are capable of conjoint use and have been so used by the Waltham Watch Company, and watch movements made and put

out by said Waltham Watch Company, since May 15, 1906, and known as "16 size Riverside Movements," have each embodied conjointly the inventions described in said patents. The inventions embodied in the improvements constitute a material and substantial feature thereof.

III. Subdivisions 11 to 16, inclusive, of the stipulated record, read as follows:

"(11) Among the watch movements manufactured by the complainant since the said 15th day of May, 1906, and for a long time prior thereto by the complainant's said predecessor, is and has been a model distinguished by the trade-mark 'Riverside.' Said trade-mark Riverside has been continuously, uninterruptedly, and exclusively used by the complainant and its said predecessor since October, 1876, and has been stamped or engraved in a conspicuous place on all such movements. Said watch movements so distinguished by the trade-mark Riverside have been during the whole of said period manufactured by the complainant and complainant's said predecessor in several sizes, one of said sizes being known as the 16 size Riverside movement, and containing 19 jewels. Said trade-mark Riverside has at all times since the 15th day of April, 1907, and for a long time prior thereto, been and is duly registered with the Commissioner of Patents of the United States, said registration being in all respects in compliance with the laws of the United States in that respect made and provided. A copy of said registration is hereto annexed and marked 'D.'

"(12) Since said 15th day of April, 1907, many watch movements bearing said trade-mark Riverside and known to the watch trade and to the public as Riverside watch movements, including many of said 16 size Riverside movements, have been sold and used in said Southern district of New York and elsewhere.

"(13) Since the said 15th day of April, 1907, all watch movements herein referred to as 16 size Riverside movements, and which have embodied and embody conjointly the inventions and improvements set forth in said three letters patent, as well as other movements made by the complainant and embodying other patented inventions and improvements, have been sold and delivered by the complainant at its regular established price only to wholesale dealers, known as jobbers, and by said jobbers to retail dealers, only in the following manner:

"All of said movements have been sold and delivered in boxes or packages, one movement in each box or package, each movement being inclosed in an inner metal box or container. Accompanying each movement and inserted in direct contact therewith in said metal box or container is a printed slip designated 'Waltham Contract Notice,' and in the case of each and every one of said 16 size Riverside movements embodying the said inventions made by the complainant, and which has since the said 15th day of April, 1907, been purchased by the defendant, the box or package containing such movements, when received by the defendant, as the defendant then well knew, also contained, as aforesaid, said Waltham Contract Notice, of which the following is a true copy, the blank space after the words 'Movement No.' containing the number corresponding with the number on the movement it accompanied:

" 'Waltham Contract Notice.

" '16 size Waltham movement No.          bearing the trade-mark Riverside 19 jewels, essential parts of which are protected by United States letters patent, is sold subject to the following conditions, which every buyer thereof by accepting this movement agrees with the undersigned company to keep and perform, viz.:    (1) Jobbers may sell this movement to established retail watch dealers, except those designated by this company, and to no other persons, and only at the price and discount authorized by this company. (The term "retail watch dealers" shall include all watch dealers other than those recognized as jobbers by this company.)    (2) Jobbers must in every instance deliver this contract notice with the movement.    (3) Retail dealers may dispose of this movement by sale only, and only to buyers for use and

not for resale and must not advertise nor sell this movement for less than $25.00. A breach of any of these conditions shall revest in the company the title to this movement and upon tendering the price paid therefor to the holder thereof the company may retake possession of the same.

"'These conditions will be enforced by the company.

"'Waltham Watch Company,
"'Waltham, Mass.'

"Said. contract notice being a true copy of the notice so used from April 15, 1907, down to the present time, excepting that on the 23d day of September, 1909, the price specified in said contract notice was changed from $25 to $28.50. The form of said box or package containing .said 16 size Riverside movements being identical in every respect with the box marked 'Exhibit E,' which is hereby made a part of this stipulation and is filed herewith.

"Subsequent to the 15th day of April, 1907, in each instance where any of the said 16 size Riverside movements have been sold or furnished by the complainant or under its authority to jobbers, there has been annexed to or printed on the invoice rendered by the complainant to such jobbers in a conspicuous place a notice designated 'Conditions of Sale (Bill to Jobbers),' of which the following is a true copy, except that certain movements enumerated therein other than the said Riverside movements were not included in the notice issued on April 15, 1907, but were added thereto after said April 15, 1907; said Riverside movements having at all times been included in said notice:

"'Conditions of Sale.

"'(Bill to Jobbers.)

"'Each Waltham movement and Waltham watch in this bill is sold subject to the following conditions and to those in the Waltham Contract Notice issued with the movement or watch, which conditions every buyer thereof by accepting said movement or watch agrees with the undersigned company to keep and perform, viz.: (1) Jobbers may sell said movements or watches, to established retail watch dealers, except those designated by said company, and to no other persons, and only at prices and discounts authorized by the said company. (2) Must bill said movements or watches only on billheads approved by said company and bearing the Condition of Sale. (3) Must not bill said movements or watches with any other goods. (4) Must not exchange said movements or watches for any other goods whatsoever. (5) The Waltham Contract Notice must be delivered with the movement or watch in every instance. These conditions govern the sale of the following movements; Vanguard, 18 size and 16 size; Crescent St., 18 size and 16 size; No. 845; Appleton, Tracy & Co., Premier; Riverside Maximus, 16 size, 12 size and 0 size; Riverside, 16 size, 12 size and 0 size; No. 645; Royal, 16 size and 12 size; all Colonial Series watches. (6) A breach of any of said conditions shall revest in the company the title to all movements of the grades named and all Colonial Series watches in the possession of the violator and of any one who shall have induced or knowingly participated in such breach; and upon tendering the price paid by the holder of such movements or watches the company may retake possession of the same. (7) Jobbers must immediately send to the company's selling agents a duplicate of every bill of the above-named movements and watches which they issue.

"'The undersigned will enforce these conditions.

"'Waltham Watch Company,
"'Waltham, Mass.'

"On the 15th day of April, 1907, the complainant established a schedule of retail prices. relating to said 16 size Riverside movements made by the complainant, which prices were contained on a printed slip or form designated 'Conditions of Sale (Bill to Retailers), of which the. following is a true copy:

''Conditions of Sale.

" '(Bill to Retailers.)

" 'Each Waltham movement specified in this bill is ·sold subject to the following conditions and to those of the Waltham Contract Notice issued with the movement, which conditions every buyer thereof by accepting said movement agrees with the undersigned company to keep and perform:   (1) All watch dealers are to be considered retail dealers, except those recognized as jobbers by said company.   (2) Retail dealers may dispose of said movements by sale only and only to buyers for use and not for resale.   (3) And may not advertise nor sell said movements for less than the following net prices, respectively:   Vanguard, 23 jewels, 18 size and 16 size, $36.00; Vanguard, 21 jewels, 18 size, $33.00; Vanguard, 19 jewels, 18 size and 16 size, $30.00; Crescent St., 21 jewels, 18 and 16 size, $27.00; Crescent St., 19 jewels, 18 size, $24.00; No. 845, $25.00; Appleton, Tracy & Co., Premier, $21.00; Riverside Maximus, 16 size and 12 size, $60.00; Riverside Maximus, 0 size, $27.00; Riverside, 16 and 12 size, 19 jewels, $25.00; No. 645, $25.00; Riverside, 0 size, $22.00; Royal, 16 size and 12 size, $16.00.   Metal dial on any of the above $1.00 additional.   (4) A breach of any of said conditions shall revest in the company the title to all movements of the grades above named which shall be in the possession of any one who shall have induced or knowingly participated in such breach, and upon tendering the price paid therefor by the holder of said movements, the company may retake possession of the same.   (5) A duplicate of this bill has been sent to the undersigned, by whom these conditions will be enforced.

" 'Waltham Watch Company,
" 'Waltham, Mass.'

"During said period all of said jobbers annexed to all bills of said watch movements sold by them to retailers copies of said 'Conditions of Sale (Bill to Retailers).'

"Said schedule of retail prices continued in force until September 23, 1909. On said September 23, 1909, a new schedule of retail prices for such movements was established by the complainant, and has continued in force down to the present time, which prices were contained on a printed slip or form which has been annexed by jobbers to all bills of said watch movements sold by them to retailers since said 23d day of September, 1909. The following is a true copy of said last-mentioned 'Conditions of Sale (Bill to Retailers.)'

" 'Conditions of Sale.

" '(Bill to Retailers.)

" 'Each Waltham movement specified in this bill is sold subject to the following conditions and to those in the Waltham Contract Notice issued with the movement, which conditions every buyer thereof by accepting said movement agrees with the undersigned company to keep and perform:   (1) All watch dealers are to be considered retail dealers, except those recognized as jobbers by said company.   (2) Retail dealers may dispose of said movements by sale only and only to buyers for use and not for resale.   (3) And may not advertise nor sell said movements for less than the following net prices, respectively:   Vanguard, 23 jewels, 18 size and 16 size, $40.00; Vanguard, 21 jewels, 18 size, $37.50; Vanguard, 19 jewels, 18 size and 16 size, $35.00; Crescent St., 21 jewels, 18 size and 16 size, $31.50; Crescent St., 19 jewels, 18 size, $30.00; No. 845, $28.00; Appleton, Tracy & Co. Premier, $21.00; Riverside Maximus, 16 size and 12 size, $70.00; Riverside Maximus, 0 size, $30.00; Riverside, 16 size and 12 size, 19 jewels, $28.50; No. 645, $28.50; Riverside, 0 size, $24.00; Royal, 16 size and 16 size, $18.00.   Metal dial on any of the above $1.00 additional.   (4) A breach of any of said conditions shall revest in the company the title to all movements of the grades above named which shall be in the possession of the violator and in the possession of any one who shall have induced or knowingly participated in such breach, and upon tendering the price paid therefor by the holder of

said movements, the company may retake possession of the same. (5) A duplicate of this bill has been sent to the undersigned, by whom these conditions will be enforced          " 'Waltham Watch Company,
                                        " 'Waltham, Mass.'

"From the said 15th day of April, 1907, down to the present time, the complainant has sold none of said 16 size Riverside movements embodying said patents and improvements, excepting in the manner and on the terms and conditions above set out.

"(14) That at various times since the 15th day of April, 1907, and prior to the month of April, 1910, and at various times subsequent thereto, the defendant has purchased and received a number of said 16 size Riverside movements, each contained in a box or package as described in paragraph 13 above, and identical in form with Exhibit E, herein referred to, and accompanied as aforesaid by a printed slip designated 'Waltham Contract Notice,' a true copy of which is above set forth. That, in each instance of the purchase by the defendant during the periods aforesaid of a 16 size Riverside movement, the bill or invoice received from the jobber contained in a conspicuous place on said bill a printed form designated 'Conditions of Sale (Bill to Retailers),' a true copy of which is set forth in said paragraph 13 of this stipulation. That at the respective times of the receipt of said bills and said watch movements said defendant had full knowledge of all said facts contained in said 'Waltham Contract Notice' and in said printed form designated 'Conditions of Sale (Bill to Retailers),' and at said times defendant had full knowledge of the prices in said 'Waltham Contract Notice' and in said 'Conditions of Sale (Bill to Retailers).' That, during the said months of April, May, June and July, 1910, and at various other times, with the full knowledge aforesaid, said defendant advertised, offered for sale and sold certain of said 16 size Riverside movements so purchased and received by him prior to April, 1910, at the following price, including a case, namely, the price of $17.35, which said movements were manufactured and sold by the complainant and were purchased by the said defendant subsequent to the said 15th day of April, 1907.

"(15) That defendant threatens to purchase and procure other of said 16 size Riverside movements and to advertise, offer for sale and sell the same at prices below those specified in said 'Waltham Contract Notice' and said 'Conditions of Sale (Bill to Retailers),' set forth in paragraph 13 of this stipulation.

"(16) If, upon the foregoing facts, the court is of opinion that the plaintiff is entitled to relief, then the relief prayed for in the plaintiff's bill or any part thereof may be granted. If, upon the foregoing facts, the court is of opinion that the plaintiff is not entitled to relief, then the plaintiff's bill may be dismissed."

[1] It is noticed that the watch movement as a whole is not patented. The patents cover the frame, the spring barrel, and dial holder; but, as stated, these are material and substantial features of the movement.

There is no allegation or stipulation that the defendant has purchased any of these movements from the complainant, or that complainant has sold him any; the fair inference is that the complainant sold the movements to jobbers, and that the defendant has purchased of such jobbers in the open market, but with knowledge of the "Waltham Contract Notice" and "Conditions of Sale (Bill to Retailers)." The defendant has violated the provisions or terms of said "Conditions of Sale (Bill to Retailers)," by selling at a lower price than that fixed thereby. The question is: Has he infringed the patents or violated a valid contract binding on him in so doing? It is evident from the facts stipulated that the complainant was and is engaged in inter-

state commerce in making and selling these watch movements, and that its dealings with defendant, if any, were interstate commerce. It is also evident that every dealer who comes into the agreement or under the contract—that is, who purchases these movements of complainant with knowledge of the conditions and assents thereto—becomes a party to an agreement and combination to keep up and control prices to users and thereby restrain trade and destroy competition. If the so-called contracts are lived up to, competition between dealers is absolutely eliminated. Under the terms of this printed slip placed in a box with each movement sold, if the purchaser pays $25 only for one of these 16 size Riverside movements, the Waltham Watch Company may take it from him on repayment of the price paid.

In Henry v. Dick Co., 224 U. S. 1, 32 Sup. Ct. 364, 56 L. Ed. 645, it seems plain from the statement of facts in the case and the opinions that the patentee sold the articles covered by the patent for less than cost and did not reap his reward for his invention, that is, his royalty or consideration for the use of his patented invention or article by way of price charged, but by way of the limitation on the use of same, that is, the provisions that the supplies used with and on the machine should be purchased of the patentee and of his manufacture and at his price. It was in this way that the patentee protected himself or secured his reward for the use of his invention.

In the case before the court we have no such facts. It appears that the patentee has received and does receive *his royalty* or consideration for the use of the patented article—watch movement—when he sells the movement. In no event does he receive any added or further compensation or consideration for the movement. In no way is he concerned with the sales made thereafter by dealers, or with the prices they charge or receive for the movements, unless it be that he is interested to have the price of the movement maintained on the theory it would injure the standing of the movements as an article of commerce to have them sold for a lesser price than that fixed by the manufacturer. In Adams v. Burke, 17 Wall. 453, 456 (21 L. Ed. 700), the court said:

"That is to say, the patentee or his assignee having *in the act of sale* received *all the royalty* or consideration which he claims for the use of his invention in that particular machine or instrument, it is open to the use of the purchaser *without further restriction* on account of the monopoly of the patentee."

It is plain that the Dick Case is not within or covered by this language for the reason stated. The case at bar is within this holding for the reason the patentee or his assignee has sold and parted with the movements on receipt of his full price or consideration. He is to reap no further profit from the transaction. Having fixed and received his consideration, including royalty, he goes further and attempts to fix and control the price at which others shall sell—part with their interest in the watch movements. He is attempting to control the *price* of these movements in the open market after parting with title and possession and after having, as to the particular articles, exercised fully the right or monopoly the patent law gives him, viz., the sole and exclusive right to vend the article. It does not seem to

me that the patent statute goes beyond this, as to vending, and confers on the patentee when he exercises the right to vend and does vend—that is, sell—the right to attach to the article in the hands of subsequent purchasers a limitation that it must be sold for a price fixed by the patentee or his assignee.

And the Henry v. Dick Co. Case is not at war or inconsistent with the holding in the Keeler v. Folding Bed Co. Case, 157 U. S. 659, 666, 15 Sup. Ct. 738, 741 (39 L. Ed. 848). The court said:

"Upon the doctrine of these cases we think it follows that one who buys patented articles of manufacture from one authorized to sell them becomes possessed of an *absolute property* in such articles, unrestricted in time or place. Whether a patentee may protect himself and his assignees by special contracts brought home to the purchasers is not a question before us, and upon which we express no opinion. It is, however, obvious that such a question would arise as a question of contract and not as one under the *inherent meaning and effect of the patent laws*. The conclusion reached does not deprive a patentee of his just rights because no article can be unfettered from the claim of his monopoly *without paying its tribute*. The inconvenience and annoyance to the public that an opposite conclusion would occasion are too obvious to require illustration."

It will be noticed that the Supreme Court was here dealing with sales of patented articles (not licenses to use) for a price and expressly declares that "no article can be unfettered from the claim of his (the patentee's) monopoly without paying its tribute." Is not this saying that when the "tribute" is fully paid the article is freed from the monopoly of the patent? As declared in Adams v. Burke, and reiterated in this Folding Bed Case, once *"the tribute" is paid* by a purchaser, the article passes clear and unfettered of the monopoly to the purchaser. This was the sum and substance of the holding of the Supreme Court in Bobbs-Merrill Co. v. Straus, 210 U. S. 339, 28 Sup. Ct. 722, 52 L. Ed. 1086, a case arising under the copyright statute. R. S. § 4952 (U. S. Comp. St. 1901, p. 3406). There the book was sold by the owner of the copyright *at the price fixed by the owner of the copyright,* and a limitation, by way of license restriction on the price at which it should be sold by the purchaser who had fully paid the "tribute," was held not binding.

In the opinion in Henry v. Dick Co., supra, 224 U. S. at page 47, 32 Sup. Ct. 379, 56 L. Ed. 645, it is said:

"There is no collision *whatever* between the decision in the Bobbs-Merrill Case and the present opinion. Each rests upon a construction of the applicable statute, *and the special facts of the cases.*"

On the preceding page (224 U. S. 46, 32 Sup. Ct. 378, 56 L. Ed. 645) the learned judge had pointed out the difference in the wording of the two statutes. It is pointed out that:

"To secure to the author an exclusive right to his writings, Congress provided that he should have 'the sole liberty of printing, reprinting, publishing, completing, copying, executing, finishing and *vending* the same.' Revised Statutes, § 4952. This is, in short, *the sole right to multiply and vend* copies of his production."

The court then proceeds to say:

"To the inventor, by section 4884, Revised Statutes (U. S. Comp. St. 1901, p. 3381), there is granted the exclusive right to make, *use* ('use' italicized),

and vend the invention or discovery. This grant, as defined in Bloomer v. McQuewan, 14 How. 539, 549 [14 L. Ed. 532], consists altogether in the right to exclude every one from making, *using* ('using' italicized), or vending the thing patented. Thus there are several substantive rights, and each is the subject of subdivision so that one person may be permitted to make, but neither to sell nor use, the patented thing. To another may be conveyed the right to *sell, but within a limited area, or for a particular use*, while to another the patentee may grant only the right to make and use, or to use only for specific purposes."

It is noted that the court has specifically refrained from saying, when detailing the substantive rights of a patentee, that he has the right to sell and attach a binding condition for resale at a specific price fixed by him only, or that such a condition by way of contract binds the purchaser so as to make a violation thereof an infringement.

The Bobbs-Merrill Case, supra, dealt with resales at a specific price fixed by the owner of the copyright, and it is inconceivable that the learned judge, in giving the opinion in the Henry v. Dick Co. Case, would have refrained from stating that among the substantive rights of the patentee is that of selling for resale at a specific price fixed by him only, if it was intended to hold or intimate any such doctrine. That a patentee may create selling agencies and control the price goes without saying; but, once sold and the royalty received by the patentee, the patented thing, so far as price is concerned, should be free of the monopoly. Prescribing the mode and manner of the *use* of a patented article by the purchaser and user, as in the Henry v. Dick Co. Case, where the limitation on ownership not only went to the preservation of the character of the machine as an operative and useful device and a merchantable article, but to the reaping of the reward for the use of the invention, the payment of the "tribute" for the right to use is one thing, while prescribing the price at which dealers shall sell the article once sold by the patentee or his assignee *for his full price* is quite another and different thing or matter. The latter goes to the fixing and control of prices in the open market for an article of merchandise, one of common, everyday use, after it has been put on the market for sale as such and after the inventor or owner of the monopoly has received his full compensation, or consideration, or "tribute" for the sole and exclusive right to use and vend the patented thing and has fully exercised his sole and exclusive right to vend.

In Bobbs-Merrill Co. v. Straus, supra, the Supreme Court expressly refused to hold that a patentee or his assignee may sell a patented article subject to a condition that it shall not be sold by the purchaser at less than a prescribed minimum price. The court refused to even consider the question, and said:

"If we were to follow the course taken in the argument and discuss the right of a patentee, under letters patent, and then, by analogy, apply the conclusions to copyrights, we might greatly embarrass the consideration of a case under letters patent when one of that character shall be presented to this court."

See what was said on this subject in Henry v. Dick Co., 224 U. S. 43, 44, 32 Sup. Ct. 377, 56 L. Ed. 645.

In Dr. Miles Medical Co. v. Park & Sons Co., 220 U. S. 373, 31 Sup. Ct. 376, 55 L. Ed. 502, the court had under consideration this

very question of the manufacturer fixing prices for future sales by a purchaser from him by agreement and notice in the case of unpatented articles made according to a secret formula owned by and known to the manufacturer only. The Supreme Court refused to indicate what its decision would be on such a question in the case of a patented article, saying:

"The complainant has no statutory grant. So far as appears, there are no letters patent relating to the remedies in question. The complainant has not seen fit to make the disclosure required by the statute and thus to secure the privileges it confers. Its case lies *outside the policy of the patent law, and the extent of the right which* that law *secures is not here involved or determined.*"

[2] I am unable to draw any distinction between the extent of the rights which the copyright law gives to the owner of a copyright and the extent of the rights which the patent law gives to the owner of a patent *so far as sales are concerned.* Each is given the sole and exclusive right to vend. Concede that the patentee has the statutory right to protect himself by contract in the lawful enjoyment of every right which his patent confers, the exclusive right to use, and the exclusive right to vend, which includes the right to confer on another the right to use as that other sees fit or in the manner prescribed in the license granted by the owner, or to vend to another absolutely, that is, give complete title, or give to that other an interest in the thing vended only so that there is a joint ownership or tenancy in common, it goes beyond all reason, I think, to hold that, when the patentee has manufactured the patented article and fixed the value thereof including his full royalty, or consideration, a compensation for the right to use and sell the article, he may put the article on the market for sale by selling to jobbers and dealers who purchase for such purpose and pay the full price fixed, and still limit and restrict them in the price they shall charge and receive for their own property. It is an attempt to monopolize and control prices and destroy competition, and, when a jobber or dealer takes a number of such articles for sale to others under such a restriction as to sales made by himself, there is at once a combination to fix prices and restrain trade in contravention of a sound public policy.

In Dr. Miles Med. Co. v. Park & Sons Co., supra, the court said:

"Nor can the manufacturer by rule and notice, in the absence of contract or statutory right, even though the restriction be known to purchasers, fix prices for future sales."

In the Bobbs-Merrill Case, the court said:

"To *add* to the right of exclusive sale the authority to control all future retail sales by notice that such sales must be made at a fixed sum would give a right not included in the terms of the statute, and, in our view, extend its operation, by construction, beyond its meaning when interpreted with a view to ascertaining the legislative intent in its enactment."

[3] I do not think the patent statute can be so unreasonably extended by construction, and clearly such a broad and sweeping construction is unnecessary to give the patentee full protection in the enjoyment of his exclusive right to vend. Having once vended the article and received his price and tribute, his exclusive right to vend

is exhausted and the article is freed from the monopoly. As to the exclusive right to vend, the language of the patent statute is no broader or more comprehensive than the copyright statute. And I cannot see that the alleged right under the contract to retake the watch movement, on paying to the purchaser the price paid by him in case it is less than that fixed by the patentee or his assignee, operates to make the sale in the first instance a conditional one which the law will recognize. If a wise and sound public policy forbids the affixing of a condition to the sale of an article, not patented, as it does, Dr. Miles Medical Co. v. Park & Sons Co., supra, whereby the purchaser and dealer must sell at a price fixed by the manufacturer, and if the affixing such a condition to a sale is not a statutory right conferred on the patentee by the patent law, then this condition to which I have referred is not one protected by the patent law and is a mere matter of contract, even if valid under the general law of contracts which the federal courts should not enforce by injunction, and which, if invalid, will not be enforced at all. It is not an infringement or contributory infringement of the patent to violate such a contract or condition unless the right to make or impose it is conferred by the patent law. The Supreme Court of the United States has declared:

"A manufacturer of unpatented articles cannot, by rule or notice, in absence of statutory right, fix prices for future sales, even though the restriction be known to purchasers. Whatever rights the manufacturer may have in that respect must be by agreements that are lawful.

"Although the earlier common-law doctrine in regard to restraint of trade has been substantially modified, the public interest is still the first consideration; to sustain the restraint it must be reasonable as to the public and parties and limited to what is reasonably necessary, under the circumstances, for the covenantee; otherwise restraints are void as against public policy.

"Agreements or combinations between dealers, having for their sole purpose the destruction of competition and fixing of prices, are injurious to the public interest and void; nor are they saved by advantages which the participants expect to derive from the enhanced price to the consumer."

If the right to fix prices for future sales of articles like a watch movement, not itself patented or covered by a patent, but which embodies in its construction two or three subordinate but essential parts which are covered by patents, and which articles have been sold by the patentee or his assignee for the full price he is to receive, is granted by the patent statute, we do not find it conferred in express terms, but by implication only. That is, we imply from the "sole right to vend" the right to fix prices for all future sales of the articles; the patentee having exercised his right to vend them and received his tribute. If the statute is so broadly construed, we impute to Congress by a statute not clear or plain and by words not ordinarily open to such construction the purpose to confer on the patentee a right in contravention and violation of a sound public policy and one not reasonably necessary to protect the patentee and which is inimical to dealers and users; that is, the general public. That the sole purpose of the owner of these patents covering certain of the parts of these watch movements (not the movement as a whole) is to destroy competition and fix retail prices cannot be questioned. The legislative grant of the right to do an act, the doing of which, in the absence of

the statute, violates public policy, should be plain and unambiguous, and couched in terms which are reasonably certain. If a statute can have no other purpose, then the language will be construed in the light of reason to make effectual such legislative intent; but when, as here, the patent statute was plainly intended to confer on the patentee the sole right to make, use, and vend his patented machine, or process, and is silent as to fixing prices for future sales by dealers, the article having been *sold* and put on the market by the patentee as an article of commerce for sale and common use, I think it goes beyond reason to say that the sole right to vend carries with it the right to fix and control prices for future sales by dealers; the patentee having exercised his right to vend and received his full consideration, or tribute, for the grant to others of the right to vend and use.

I desire to repeat and emphasize the distinction between this case and the license agreements, such as that in the Henry v. Dick Co. Case, relating to the use of the patented article. Here the patentee or his assignee makes and sells the article imposing no condition as to use, and reserving no interest in or claim to any part of the proceeds of a resale by dealers. He receives his full consideration or compensation or tribute for his invention, so far as each particular article is concerned, when he sells. In the Henry v. Dick Co. Case, and other like cases, he reserves a right and interest in the use of the article; does not receive his full consideration, compensation, or tribute for his invention, so far as that particular article is concerned, but is to receive such consideration or tribute from the user by way of profit on the supplies he is to furnish for use therewith and from which he derives his only profit, compensation, or tribute. In the first case the article, when sold, is freed from the monopoly, while in the latter it is not. And again, there is no rule of public policy, so far as I am aware, which forbids a restriction on the use to which a patented article shall be put, or the mode and manner of using it, while public policy does forbid the fixing of prices for future sales unless the right to do so be granted by legislative enactment. I am opposed to monopoly in prices, and think the rule in opposition thereto declared by the Supreme Court should be enforced. Agreements, however designed and under whatever pretense made, having in view and for their object the monopoly or control of prices to the user and consumer and the destruction of competition, are void. But, of course, the Congress of the United States can authorize a monopoly as it has done in the case of articles covered by a patent, but that monopoly has its limits, and a broad construction in contravention of public policy should be justified by the language of the patent statutes and not given when unnecessary to protect the legitimate rights of the patentee and make effectual the purpose of Congress in its enactment. If the Congress of the United States desires to authorize patentees to control and monopolize the retail prices of articles covered in part or in whole by a patent, after same have been once sold by the patentee or his assignee and placed on the market and after he has actually pocketed his full reward or tribute for the use of the monopoly by the public (as to the articles so sold), let it so say in plain terms.

In view of Bobbs-Merrill Co. v. Straus, Henry v. Dick Co., Dr. Miles Med. Co. v. Park & Sons Co., and Standard Mfg. Co. v. U. S., 226 U. S. 20, 33 Sup. Ct. 9, 57 L. Ed. ——, decided November 18, 1912, all recent declarations of the Supreme Court of the United States, I do not think the patent statute can be given the construction contended for, one which authorizes the patentee or his assignee to fix and control prices on resale after he has once sold, received his full consideration or tribute for the use of the patented article—in other words, after he has exhausted his sole and exclusive right to vend, as then the article is freed from the monopoly. I find nothing in Bement v. National Harrow Co., 186 U. S. 70, 91, 22 Sup. Ct. 747, 752 (46 L. Ed. 1058), really inconsistent with these views. In that case Mr. Justice Peckham, who delivered the opinion of the court, said:

"The only federal question raised in the record is as to the validity of contracts A and B with regard to the act of Congress on the subject of trusts. Act of July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]."

There the plaintiff was the owner of certain patents relating to spring tooth harrows, and he granted licenses to the defendant to manufacture and sell the harrows embodying the inventions covered by the patents. The license to so manufacture and sell was limited and terminable and provided for the payment by the licensee to the licensor of a royalty of $1 for each harrow or frame sold by it pursuant to the license. The licensee was not to ship harrows to any person to sell on commission or allow any rebate or reduction from the price or prices fixed in the license, except to settle with an insolvent debtor for harrows previously sold and delivered. The defendant agreed it would not sell such harrows at a less price or on more favorable terms than those prescribed in the license agreement, and which might be changed from time to time by the licensor. See 186 U. S. 72, 22 Sup. Ct. 747, 46 L. Ed. 1058. Here, it is seen, the owner of the patents did not manufacture or sell. He licensed another to do both on certain conditions and subject to certain restrictions. There was no limitation on or fixing of prices on resales. And, moreover, the owner of the patent had a direct pecuniary interest in each sale of a harrow or frame made and sold by his licensee, viz., his royalty of $1. At page 93 of 186 U. S., at page 756 of 22 Sup. Ct. (46 L. Ed. 1058), the court said:

"In these contracts provision is expressly made, not alone for manufacture, but for the sale, of the manufactured product throughout the United States, and at prices which are particularly stated, and which the seller is not at liberty to decrease without the assent of the licensor. Addystone Pipe & Steel Co. v. United States, 175 U. S. 211, 238 [20 Sup. Ct. 96, 44 L. Ed. 136]. These contracts directly affected, not as a mere incident of manufacture, the sale of the implements all over the country, and the question arising is whether the contracts which thus affect such sales are void under the act of Congress.

"On looking through these licenses we have been unable to find any conditions contained therein rendering the agreement void because of a violation of that act. There had been, as the referee finds, a large amount of litigation between the many parties claiming to own various patents covering these implements. Suits for infringements and for injunction had been frequent, and it was desirable to prevent them in the future. This execution

of these contracts did in fact settle a large amount of litigation regarding the validity of many patents as found by the referee. This was a legitimate and desirable result in itself. The provision in regard to the price at which the licensee would sell the article manufactured under the license was also an appropriate and reasonable condition. It tended to keep up the price of the implements manufactured and sold, but that was only recognizing the nature of the property dealt in, and providing for its value so far as possible. This the parties were legally entitled to do. The owner of a patented article can, of course, charge such price as he may choose, and the owner of a patent may assign it or sell the right to manufacture and sell the article patented upon the condition that the assignee shall charge a certain amount for such article."

It is noted that the rights of this licensee were measured by the right granted, and hence the court said:

"The owner of a patented article can, of course, charge such price as he may choose, and the owner of a patent may assign it (the patent) or sell the right to *manufacture and sell* the article patented upon the condition that the assignee shall charge a certain amount for such article."

This was but a fixing of the price by the patentee himself at which it should go on the market at all as a product manufactured under the patent. The sale by the licensee was the original sale and but the exercise of the sole right to vend given the patentee by the patent law. It is immaterial that the patentee exercised this sole right to make and sell through his agent or his licensee. Neither the licenses, the case nor the court dealt with resales by dealers who had purchased from such licensee and paid the full price, including royalty or tribute, for the article, or the validity of agreements between manufacturers who own the patents and sell to dealers and such dealers, to sell only at prices fixed by such manufacturer.

In Bement v. National Harrow Co., supra, Mr. Justice Peckham also said:

"The very object of these laws is monopoly, and the rule is, *with few exceptions*, that any conditions which are not *in their very nature illegal* with regard to this kind of property, imposed by the patentee and agreed to by the licensee for the right to manufacture or use or sell the article, will be upheld by the courts. The fact that the condition in the contracts keep up the monopoly or fix prices does not render them illegal."

But Mr. Justice Peckham was not speaking of license agreements or contracts whereby the patentee, on making and selling the article covered by his patent, and in which sale he receives his full compensation and royalty, goes beyond and attempts to bind purchasers and dealers, who purchase from the patentee's vendee, to sell such article only at the price fixed by the patentee. And the decision in Dr. Miles Med. Co. v. Park & Sons Co., supra, had not then been rendered.

In Standard Sanitary Manufacturing Co. v. United States, 226 U. S. 20, 33 Sup. Ct. 9, 57 L. Ed. ——, decided November 18, 1912, there was in the first place a combination of the manufacturers operating under patents and to control prices. They brought in jobbers and dealers who, in order to obtain goods at all, were compelled to submit to the condition that they sell only at the prices fixed by the combination of manufacturers. Here there is one manufacturer only, and he owns the patent, and he fixes the price at which he sells to

jobbers, which he has the right to do; but he attempts to fix and control the price at which jobbers and dealers must sell to the users or consumers. In the case last cited, Standard Sanitary Case, the court, per Mr. Justice McKenna, said, after stating the combination of the manufacturers:

"And the jobbers were brought into the combination and made its subjection complete and its purpose successful. Unless they entered the combination they could obtain no enamel ware from any manufacturer who was in the combination, and the condition of entry was not to resell to plumbers except at the prices determined by the manufacturers. The trade was therefore practically controlled from producer to consumer, and the potency of the scheme was established by the co-operation of 85 per cent. of the manufacturers, and their fidelity to it was secured not only by trade advantages, but by what was practically a pecuniary penalty, not inaptly termed in the argument cash bail. The royalty for each furnace was $5, 85 per cent. of which was to be returned if the agreement was faithfully observed; it was to be forfeited as a penalty if the agreement was violated. And for faithful observance of their engagements the jobbers, too, were entitled to rebates from their purchases. It is testified that 90 per cent. of the jobbers in number and more than 90 per cent. in purchasing power joined the combination. The agreements clearly, therefore, transcended what was necessary to protect the use of the patent or the monopoly which the law conferred upon it. They passed to the purpose and accomplished a restraint of trade condemned by the Sherman Law."

Reduced to practical operation, this was a combination of all, or substantially all, manufacturers, operating under the protection of a patent, to fix and control the prices for future sale, into which all jobbers as a condition of selling the product at all were compelled to come, and to make the combination at all effective these jobbers must be in the combination and live up to the conditions as to prices. The combination was evil and in violation of the Sherman Law for the reason it resulted in a restraint of trade, and this for the principal reason it fixed and controlled prices to the consumer and eliminated competition.

Now, in substance and effect, so far as the general public and its interests are concerned, where is the substantial difference between that combination and the one in the case at bar? If several owners of patents or licensees under patents, capable of conjoint use, and having the right to manufacture and sell or not to manufacture and sell at all, as they please, agree that they will not manufacture and sell, they have but agreed to not do that which they have a right not to do. But, when agreeing to both manufacture and sell, they go beyond, and not only fix the sale price at which they will sell, thus doing away with competition between themselves, but fix the price at which all future sales must be made by jobbers and dealers generally, thus doing away with all competition between jobbers and retail dealers as to articles which they have put on the market, they have clearly agreed and combined to restrain trade, and every jobber and dealer who comes in and assents becomes a party to such illegal combination, which is illegal principally because it has for its purpose the fixing of prices for sales to the general public, the consumers, and the destruction of competition, which, if existing, would inure to the benefit of such consumers. Can it be that a patentee, himself manufacturing under his patent and

the sole manufacturer, and thus controlling the entire output of the article, can bring into combination with himself all jobbers and dealers, or all jobbers and dealers in that article, and by agreement fix not only the price, including royalty, at which the patentee sells, but the prices on resale to consumers, and thus do away with all competition and deprive the public of the benefits of competition? If the *one* transaction or combination transcends what is "necessary to protect the use of the patent or the monopoly which the law conferred upon it," it seems to me clear that the other does. The effect on the public is precisely the same in both cases. If two patentees, or licensees of a patentee, cannot combine with each other and jobbers to control prices on the sales of articles made by such patentees or licensees, how is it that one patentee or licensee who manufactures under his patent can so combine? There is a combination in both cases, and, so far as the public is concerned, the one is as detrimental to the public interests as the other.

In the case of D. E. Virtue and Owatonna Fanning Mill Co. v. Creamery Package Mfg. Co. et al., 227 U. S. 8, 33 Sup. Ct. 202, 57 L. Ed. ——, decided by the Supreme Court of the United States January 20, 1913, the Owatonna Company was a manufacturer of churns and butter workers under various patents owned by it, and in April, 1897, it created the Creamery Package Manufacturing Company, its sales agent of them, the latter not manufacturing, which the court held it had the right to do, and that in so doing it had the right to fix the prices at which *its sales agent should sell* and the territory in which it should sell, and even the purpose for which it should sell. The court said:

"It is true they granted rights to the Creamery Package Manufacturing Company, and exclusive rights; but this was no violation of law. The owner of a patent has exclusive rights—rights of making, using, and selling. He may keep them or transfer them to another—keep some of them and transfer others. This is elementary; and, keeping it in mind, there is no trouble in estimating the character of such rights or their transfer. Of course, patents and patent rights cannot be made a cover for a violation of law, as we said in Standard Sanitary Manufacturing Co. v. United States, ante. But patents are not so used when the rights conferred upon them by law are only exercised."

The case just cited has nothing to do with restrictions, license agreements, or contracts attempting to fix the prices of such articles on resales when the sole right of vending has once been exercised by the sales agent. As stated, an exclusive sales agent of the manufacturer under a patent is but exercising the sole right to vend expressly conferred by the patent statute. However, attempting to fix prices at which purchasers from such sales agent shall sell—that is, controlling prices in the future for future sales—is quite a different matter, and is but recurring to the proposition, Is the right conferred by the patent law on a manufacturer under a patent owned by him, and who sells to jobbers for resale, and who on such sale receives his full price and royalty, reserving no interest in the article, unless it be to control prices on resale, one which authorizes him to make contracts with such dealers that they shall resell at prices fixed by him only? I am

aware that prior to the recent decisions of the Supreme Court on this general subject it has been several times held that such limitations on resales may be made, and that the right is conferred by the patent statute, but it seems to me clear that the decisions of the highest court of the land recently pronounced require a different conclusion in this case. I think it depends on the true construction of the patent statute (section 4884), which reads:

"Every patent shall contain a short title or description of the invention or discovery, correctly indicating its nature and design, and a grant to the patentee, his heirs or assigns, for the term of seventeen years, of the exclusive right to make, use and vend the invention or discovery throughout the United States, and the territories thereof, referring to the specification for the particulars thereof. A copy of the specification and drawings shall be annexed to the patent and be a part thereof."

Now, compare this with section 4952, relating to copyrights, which reads as follows:

"The author, inventor, designer or proprietor of any book, map, chart, dramatic or musical composition, engraving, cut, print, or photograph or negative thereof, or of a painting, drawing, chromo, statue, statuary, and of models or designs intended to be perfected as works of the fine arts, and the executors, administrators, or assigns of any such person shall, upon complying with the provisions of this chapter, have the sole liberty of printing, reprinting, publishing, completing, copying, executing, finishing, and vending the same; and, in the case of dramatic composition, of publicly performing or representing it or causing it to be performed or represented by others; and authors or their assigns shall have exclusive right to dramatize and translate any of their works for which copyright shall have been obtained under the laws of the United States."

[4] Is there any difference between the "exclusive right to vend" applied to an article made under a patent and once sold and put on the market, and "the sole liberty of vending" as applied to a copyrighted book once sold and put on the market? So far as vending is concerned, may the owner of the one right impose a condition fixing prices on resales that the other may not? Has Congress made any distinction between the "sole liberty" of the author or proprietor of the book "to vend" and the "exclusive right" of the inventor "to vend"?

"For the purpose of determining the meaning, although not the validity, of a statute, recourse may be had to considerations of public policy." 36 Cyc. 1111; Opinion of Justices, 7 Mass. 523; Jersey City Gaslight Co. v. Consumers' Gas Co., 40 N. J. Eq. 427, 2 Atl. 922; Baxter v. Tripp, 12 R. I. 310.

In 7 Mass., supra, 524, the learned judges said:

"Two of these maxims we will mention: That the natural import of the words of any legislative act, according to the common use of them, when applied to the subject-matter of the act, is to be considered as expressing the intention of the Legislature; unless the intention, so resulting from the ordinary import of the words, be repugnant to sound, acknowledged principles of national policy. And if that intention be repugnant to such principles of national policy, then the import of the words ought to be enlarged or restrained, so that it may comport with those principles; unless the intention of the Legislature be clearly and manifestly repugnant to them. For, although it is not to be presumed that a Legislature will violate principles of public policy, yet an intention of the Legislature repugnant to those principles, clearly, manifestly, and constitutionally expressed, must have the force of law."

202 F.—16

In Jersey City, etc., v. Consumers', etc., supra, the court held:

"In construing a statute a purpose to disregard sound public policy must not be attributed to the lawmaking power, except upon the most cogent evidence."

In the opinion the court said:

"Such a purpose is so manifestly opposed to sound public policy, so contrary to the spirit of our laws, and so clearly in conflict with popular judgment, that it should not be attributed to the Legislature, except upon the most cogent evidence."

In Baxter v. Tripp, supra, the court held:

"The court could not declare an act of the Legislature *void* as against public policy, considerations of public policy being admissible in *construing* an act but not in determining its validity."

In Bird v. U. S., 187 U. S. 118, 23 Sup. Ct. 42, 47 L. Ed. 100, the court held:

"The courts should avoid a construction which would render a statute ineffective or inefficient, *or which would cause a grave, public injury, or even inconvenience,* if another and more reasonable interpretation is present in the statute."

If public policy forbids such agreements as to resales—fixing prices —shall we read into the patent statute by construction words which violate that public policy? Will not that work a public injury? That which public policy demands is for the public good. That which public policy forbids, works, if done, a public injury. So a statute should never be construed to violate the law of nations. The Betsy, 2 Cranch, 64, 2 L. Ed. 208.

On this subject of fixing prices for resales by dealers to consumers, the Supreme Court of the United States has declared that such limitations are opposed to a sound public policy and void (Dr. Miles Medical Co. v. Park & Sons Co., supra); and that a combination having that for its object is illegal (Standard Sanitary Mfg. Co. v. U. S., supra); and that "the sole liberty to vend" given by the statute quoted to the author of a copyrighted book confers no right to fix prices on resales (Bobbs-Merrill Co. v. Straus, supra). What, in the light of these cases and the others cited, is the reasonable and inevitable conclusion in arriving at the true interpretation and meaning of the patent statute quoted?

The purpose of the one statute is to protect the author in the enjoyment of his "sole liberty," meaning right, to multiply and vend, while the purpose of the other is to protect the inventor in the enjoyment of his sole or exclusive right or liberty to vend. That "the sole liberty * * * of vending the same," as applied to a copyrighted book, is the same as the "exclusive right to vend" a patented article, is plainly stated in Bobbs-Merrill v. Straus, 210 U. S. 350, 351, 28 Sup. Ct. 722, 726 (52 L. Ed. 1086), where it is said:

"True, the statute also secures to make this right of multiplication effectual, *the sole right to vend copies of the book,* the production of the author's thought and conception."

To repeat, if the statute has given to the owner of the copyright "the sole right to vend" the book, the product of his thought and concep-

tion, and he may not and cannot, when he sells such book, impose conditions fixing the price that must be charged on a resale, by what process of reasoning do we arrive at the conclusion that the owner of the patent, to whom is given by statute the "sole right to vend" the machine, the product of his thought and conception, may and can impose conditions, when he sells such machine, fixing the price that must be charged on a resale. Is *the same right* given in the same legal language by statute to the inventor any more sacred than that given the author, or to be broadened in the one case and narrowed in the other? Does "the sole right to vend" in the case of a patented article confer on the patentee or his assignee the right to fix prices on resale by the patentee's vendee, when "the sole right to vend" in the case of a copyrighted book does not confer such right on the owner of the copyright? If so, why? True, a book is not a machine; but it is an article of commerce when once sold for resale the same as a machine, and in both cases, in the absence of a statute, such a restriction on resale is void as opposed to public policy. The sole right to vend is given in both cases as a reward and protection for a mental conception. The purpose and policy of the statute is the same in the one case as in the other, and I fail to discover any reason for giving a construction to the one statute different. from that given the other so far as fixing prices on resales is concerned.

The principles enunciated by the Supreme Court of the United States are controlling, and there will be a decree dismissing the bill, with costs.