## NEWPORT INDUSTRIES, Inc., v. CROSBY NAVAL STORES, Inc., et al.

### Civ. A. No. 129.

District Court, S. D. Mississippi, S. D.

Dec. 18, 1942.

Charles W. Hills, of Chicago, Ill., and Mize, Thompson & Mize, of Gulfport, Miss., for plaintiff.

Clarence B. Des Jardins, of Cincinnati, Ohio, Robb & Robb, of Washington, D. C., Eaton & Eaton, of Gulfport, Miss., and Hall & Hall, of Columbia, Miss., for defendants.

MIZE, District Judge.

The court makes the following finds of fact:

1. This is a suit involving questions of validity and infringement of United States Letters Patent to Robert C. Palmer Nos. 1,794,537, 1,794,539 and 1,810,222, and to Robert C. Palmer, John L. Burda and Anthony F. Oliver No. 1,807,599, and also involves the question of whether the defendants have wrongfully appropriated a straight alcohol revivification process claimed by the plaintiff to be maintained in secrecy by it.

2. The Palmer Patent No. 1,794,537 discloses and claims a process for the revivification of a purifying and decolorizing clay, such as fuller's earth, that has been contaminated through use in a process of decolorizing rosins.

3. The Palmer Patent No. 1,794,539 is a continuation in part of the application which resulted in the issuance of Palmer Patent No. 1,794,537. Said Patent No. 1,794,539 specifically discloses other revivification solvents and claims the revivification process more broadly.

4. The Palmer et al. Patent No. 1,807,-599 discloses and claims a process for the pre-purifying of crude wood rosin for the purpose of increasing the effectiveness of the subsequent decolorization step by means of fuller's earth.

5. The Palmer Patent No. 1,810,222 discloses and claims a process for purifying and decolorizing rosin to produce purified rosins up to and including the highest grades known to the trade as WW and X rosins. The patent also discloses and claims a new wood rosin product corresponding in color to WW rosin or better and to X standard.

6. Up until 1928 the only wood rosin plaintiff's predecessors manufactured commercially was a crude wood rosin that was designated, prior to 1923, as E grade and thereafter by the letters FF. This crude wood rosin was dark colored, almost black when in a large mass, and because of its depth of color it could not satisfactorily be used for many purposes where gum rosin was used. As a consequence there was a great oversupply of wood rosin so that it sold at a very low price.

7. It was generally recognized in the industry that a much higher price could be obtained for wood rosin if its color could be made considerably lighter so that it could be used in place of the more expensive gum rosin. As early as 1920 plaintiff's predecessors, realizing the benefits which would accrue to them from a discovery of a process for decolorization of

wood rosin so as to produce the lighter grades, embarked upon an extensive research program with the object of developing a process for the manufacture of those paler grades of wood rosin and thus obtain greater usefulness for its product and better stabilize its wood rosin business. This research program lasted over a period of nine years, during which various processes were tried out and found unsuited to the commercial production of pale grades of wood rosin for economic or other reasons. In the course of these experiments plaintiff sought to produce pale grades of wood rosin by the vacuum distillation process and by the use of selective solvents.

8. There were many problems that had to be solved before fuller's earth could be satisfactorily and economically used for the decolorizing of crude wood rosin. In the decolorizing of petroleum oils small amounts of fuller's earth effectively decolorized relatively large amounts of oil, whereas in the case of wood rosin as much as three parts of fuller's earth to one part of rosin by weight were found necessary to remove most of the color from the crude wood rosin. This gave rise to the problem of re-using the fuller's earth because fuller's earth was so expensive as to make the use of it in the commercial production of pale grades of wood rosin uneconomical unless it could be re-used without removing the spent fuller's earth and calcining the same, as was taught in the patents and publications relied upon by the defendants.

9. This problem was solved by the inventions of the process patents in suit with the result that some of the fuller's earth in plaintiff's towers has been re-used as many as 1500 times in the commercial production of pale grades of wood rosin and there appears to be no limit to the number of such uses other than that caused by mechanical losses. Such longevity of useful life of fuller's earth was not heard of in the petroleum field where the maximum number of revivifications were of the order of ten or twelve and where each revivification meant the removal of the fuller's earth from a filtration tower for burning or calcining. A further problem which confronted the inventors of the process patents in suit arose from the peculiar properties of polymerizing terpenes that fuller's earth was found to possess resulting in contaminating the adsorptive capacity of the earth and reducing one quality of the resulting rosin. This latter problem was solved by removing the terpenes, including pine oil, from the rosin before the latter was filtered through the fuller's earth and redissolving the terpene-free rosin in a fresh hydrocarbon such as naphtha. The process so discovered and invented is disclosed and claimed in Palmer et al. Patent No. 1,807,599.

10. Plaintiff's predecessors spent nine years in carrying on this research program and in the development of the process of the patents in suit at a cost of at least $100,000.

11. Almost immediately after the processes of the patents in suit were invented, plaintiff's predecessor, at great expense, changed over and adopted, and plaintiff and its predecessor have since then continuously used, in the commercial production of pale grades of wood rosin, the processes disclosed and claimed in said Patents Nos. 1,794,537 and 1,807,599.

12. Robert C. Palmer, John L. Burda and Anthony F. Oliver were the first to discover and invent a satisfactory process for the decolorizing of wood rosin by filtration through fuller's earth or a decolorizing clay and this new and novel process is fully, clearly and concisely described in Patent No. 1,807,599 which was issued to them for that process. There was a previous demand for such a process and others skilled in the art attempted to invent such a process but were unsuccessful. The patentees discovered and invented that process after long and expensive experimentation and said process was adopted by plaintiff's predecessor for the commercial production of pale grades of wood rosin shortly after its discovery and has been continuously so used by plaintiff and its predecessor since then.

13. The process defined by claims 1 to 7, inclusive, and 10 of Patent No. 1,807,599 in suit is new and useful and amounts to invention. The patentees thereof were the first, original and joint inventors of said process and said process is not anticipated by any method of decolorizing wood rosin by filtration through fuller's earth, or the equivalent thereof, previously known or used in the United States; nor was said process patented or described in any printed publication in this or any foreign country at any time prior to the invention thereof by the patentees of Patent No. 1,807,599 or more than two years before the date of the actual filing of their

application for said patent, and said process was not in public use or on sale in this country for more than two years prior to such filing.

14. The patents cited by the defendants do not anticipate the invention patented by the claims of Patent No. 1,807,599 in suit. That patent was granted by the United States Patent Office with the most pertinent prior art before it to which the patentees themselves called attention.

15. Sherwood and Cole Patent No. 1,-505,438 does not disclose the removal of substantially all of the terpenes before filtration through the fuller's earth. Nor does that patent even suggest that the terpene-free rosin be redissolved before filtering it through the fuller's earth.

16. The Yaryan Patent No. 992,325 is not even relevant because it discloses what is admittedly old.

17. The other Yaryan Patent No. 934,-247 does not disclose that crude rosin as such is re-dissolved in a fresh hydrocarbon, such as naphtha, uncontaminated with terpenes, as taught and claimed by the Palmer et al. Patent No. 1,807,599 in suit. Nor does said Yaryan Patent No. 934,257 disclose the filtration of any kind of a solution of rosin through fuller's earth.

18. The Cole Patent No. 1,523,802 does not disclose or even suggest that a re-solution of rosin is contemplated. Nor does said patent show any solution of the problem of preventing polymerization of terpenes. In fact the contrary is indicated in that patent because it discloses pine oil as the revivifying solvent which the Palmer et al. Patent No. 1,807,599 in suit classifies as a terpene.

19. The other prior art patents cited by the defendants relate to the solvent method for the revivification of rosin. They do not relate to fuller's earth. The use of the method to which those patents relate does not give rise to any problem due to the polymerization of terpenes as the solvents there specified have no polymerizing effect upon terpenes.

20. The disclosure in the Palmer Patent No. 1,810,222 in suit does not anticipate the claims of the Palmer et al. Patent No. 1,-807,599 in suit, because Palmer did not claim in Patent No. 1,810,222 that the re-solution step was his sole invention.

21. The invention covered by the claims of Patent No. 1,807,599 in suit is meritorious and constitutes a substantial contribution to the art.

22. Robert C. Palmer was the first to discover and invent a satisfactory process for the revivification of a decolorizing clay such as fuller's earth that has been contaminated through use in a process for decolorizing wood rosin and his novel process is fully, clearly and concisely described in Patents Nos. 1,794,537 and 1,794,539 in suit. Although there was a previous demand for such a process and others skilled in the art attempted to invent such a process, they were unsuccessful and Mr. Palmer was the first and original inventor thereof. He discovered and invented that process after long and expensive experimentation. Said process was adopted by plaintiff's predecessor for the commercial production of pale grades of wood rosin shortly after Mr. Palmer's invention thereof and has been continuously so used by the plaintiff and its predecessor since then.

23. The process defined by claims 1, 2 and 5 of Palmer Patent No. 1,794,537 and claims 1 to 10, inclusive, of Palmer Patent No. 1,794,539 is new and useful and amounts to invention. The said process is not anticipated by any method of revivifying a decolorizing clay (such as fuller's earth or the equivalent thereof) that has been contaminated through use in a process of decolorizing wood rosin, previously known or used in the United States. Nor was the process of said patents patented or described in any printed publication in this or any foreign country at any time prior to Mr. Palmer's invention thereof or more than two years before the date of the actual filing of his application for said patents Nos. 1,794,537 and 1,794,539, and said process was not in public use or on sale in this country for more than two years prior to such filing.

24. The patents cited by the defendants do not anticipate the invention patented by the claims in suit of Patents Nos. 1,794,-537 and 1,794,539. Patents 1,794,537 and 1,794,539 were granted by the United States Patent Office after an examination of the most pertinent prior art.

25. Of all of the patents cited by the defendants only Sherwood and Cole Patent No. 1,505,438 and Cole Patent No. 1,523,-802 relate to the decolorization of rosin. All of the other patents and publications cited by the defendants are directed to a different art which is not analogous to the

426

art to which the patents in suit relate. The defendants' expert specified Sherwood and Cole Patent No. 1,505,438 as defendants' best reference, but that patent does not disclose a process that even closely approximates that claimed in Palmer Patent No. 1,794,537 in suit. Said Sherwood and Cole patent discloses a process which includes passing dry steam through the filtering medium and a calcining step to remove the last traces of solvent. The steaming and calcining steps are quite different from the step called for by each of the claims in suit of Patent No. 1,794,537. Said Sherwood and Cole patent contains no definite disclosure of the procedural steps in the treatment of the filtering medium and there is no disclosure in that Sherwood and Cole patent of the last step in the process patented by the claims in suit of said Palmer Patent No. 1,794,537. The Cole Patent No. 1,523,802 discloses a revivification process employing pine oil which is not an alcohol within the common meaning of that term as used in the claims in suit of the Palmer Patent No. 1,794,537.

26. The Hall Patent No. 1,709,261, selected by defendants as the best approximation of defendant's revivification process to be found in the prior art, lacks the basic concept of the revivification process patented by the claims in suit of Palmer Patents Nos. 1,794,537 and 1,794,539. In the process of revivification used by Crosby Naval Stores, as the adsorbent power of the Coenite in the percolation towers becomes spent, the individual towers are periodically cut out of the percolating cycle for revivification. To revivify the Coenite in the tower, it is first flooded with naphtha obtained from the same naphtha storage supply used to make up the FF solution. This flooding of the Coenite in the tower removes any FF solution remaining therein from the percolation cycle, which weak FF solution is recirculated with the naphtha to the FF solution mixer. After this first flooding operation, 93% to 95% ethyl alcohol is withdrawn from a storage tank, preheated to 73°–78° C., and slowly directed through the Coenite in the tower, displacing the naphtha remaining therein from the previous flooding operation. The alcohol thereupon removes the coloring matter from the Coenite, and the coloring matter passes off with the alcohol, leaving the Coenite revivified for re-use in the percolation cycle. The alcohol is displaced from the tower by passing hot naphtha at 80°–100° C. through the tower, and the flooding with hot naphtha is followed by flooding with cool naphtha to bring down the temperature of the tower and bed of Coenite to normal temperature of about 25° C. The tower is now ready to be restored immediately to the percolation cycle and another spent tower removed for revivification by the procedure described. The alcohol (with the dissolved coloring matter) and naphtha used in the last two flooding operations are collected in a common tank as they come from the percolation tower being revivified, and from this tank they are fed to the "B"-resin-alcohol recovery system for recovery of the naphtha, alcohol and coloring matter, the latter being known as "B"-resin. The liquids are distilled to separate the "B"-resin from the alcohol and naphtha, and the distillate, which consists of alcohol and naphtha, is sprayed with water to dilute the alcohol to a point where it will separate by gravity from the naphtha. The naphtha having been removed by gravity separation is ready for re-use in the revivification process. The alcohol diluted with water passes through a rectifying still which rectifies it to produce 95% ethyl alcohol for re-use in revivification.

27. The use of naphtha to displace the alcohol as called for in the claims of Patent No. 1,794,537 in suit is not disclosed in any of the prior art patents and publications and such use led to an unexpected, novel and unobvious result. Therefore the discovery that naphtha can remove substantially all of the alcohol from the adsorbent clay or fuller's earth amounts to invention.

28. The differences between the processes for decolorizing wood rosin used by the defendants and the Palmer et al. Patent No. 1,807,599 are substantial differences and real differences. The differences between the process for revivifying the adsorbent Coenite uesd by the defendants and the processes of the Palmer Patents Nos. 1,794,537 and 1,794,539 are substantial.

29. Claims 1 to 7, inclusive, and 10 of Patent No. 1,807,599 are in suit but are not infringed by defendants' process of purifying wood rosin. Claims 1, 2 and 5 of Patent No. 1,794,537 and claims 1 to 10, inclusive, of Patent No. 1,794,539 are in suit but are not infringed by defendants' process of revivifying its adsorbent agent that has been contaminated through use by the defendants in their process of decolorizing their wood rosins.

30. Robert C. Palmer was the first to commercially produce a wood rosin of WW or X grade, and claims 5 and 6 of Palmer Patent No. 1,810,222 in suit cover that product. The Patent Office issued Patent No. 1,810,222 after a consideration of the best prior art, including the patent to Sherwood and Cole which defendants assert is their best reference. Furthermore, Hercules Powder Company, who owns that Sherwood and Cole patent, has never commercially used the process of that patent.

31. Claims 5 and 6 of Patent 1,810,222 in suit cover wood rosin corresponding in color to WW rosin or better and to X standard, substantially identical with wood rosin obtainable by treating a rosin extract as specified in the claims. The defendants' commercial pale wood rosins are produced as follows: FF wood rosin, while still in liquid condition, is directed from the FF rosin refinery into a mixer (Pl. Ex. 2A) in which it is mixed with naphtha to form an FF solution. The naphtha used for this purpose is that recovered from the first and second stage evaporators of the pale rosin plant, in which the pale rosin is recovered, and is contaminated with terpenes due to the impossibility of making a clean-cut separation between naphtha and terpenes in said evaporators. Weak FF solution, displaced from the percolation tower during the first stage of revivification, is also recirculated with said naphtha to the mixer The FF rosin solution formed in the mixer is directed to washers in which it is washed with water at atmospheric temperature to cool the solution and remove the nigre. The washed FF rosin solution is then directed through a series of percolation towers filled with natural magnesium silicate known as Coenite. The Coenite, as received, is washed with water in the tower and freed from the greater part of its fines, followed by a conditioning operation involving a wash with 95% ethyl alcohol to remove water soaked up during the initial wash, and then washed with hot naphtha to displace the alcohol. This magnesium silicate acts as an adsorbent to remove the color bodies from the rosin as the FF solution passes through it. The pale rosin naphtha solution coming from the percolation towers to evaporators which separate naphtha and terpenes from the pale wood rosin, which is directed to drums in which it is sold. The naphtha coming from the first and second stages of the evaporators, contaminated with terpenes, is recirculated to the FF solution mixer, while the naphtha and terpenes, coming from the third stage of the evaporators, pass to the crude terpene feed tank in the FF rosin plant and, thence, to the stills for the separation of naphtha, turpentine, dipentene and pine oil. By this process, Crosby Naval Stores produces wood rosin of grades H to X, inclusive, the rosin concentration and the ratio of FF solution to Coenite being varied according to the grade to be produced.

32. The products defined by claims 5 and 6 of Patent No. 1,810,222 are new and useful and their discovery amounts to invention. The patentee thereof was the first and original inventor of said products and said products are not anticipated by any product previously known or used in the United States; nor was said product patented or described in any printed publication in this or any foreign country at any time prior to the invention thereof by the patentee of Patent No. 1,810,222, or more than two years before the date of the actual filing of his application for said patent, and said product was not in public use or on sale in this country for more than two years prior to such filing.

33. The patents cited by the defendants do not anticipate the invention patented by claims 5 and 6 in suit of Patent No. 1,810,-222.

34. Defendant Goodyear Yellow Pine Company is a lumber company, having extensive operations in Mississippi. L. O. Crosby, Sr., has been President of that company since 1920, and controls its policies. Prior to November 1, 1938, his three sons, R. Howell Crosby, L. O. Crosby, Jr., and H. H. Crosby, were officers and directors of Goodyear. In the spring of 1937 Goodyear began preparations to build a naval stores manufacturing plant for the extraction of turpentine, pine oil, and wood rosin from pine stumps. From November 1, 1937 to November 1, 1938, this plant was operated by Goodyear under the name of Crosby Naval Stores Company. On November 1, 1938 defendant Crosby Naval Stores, Inc., was organized and began business, and at that time R. Howell Crosby, L. O. Crosby, Jr., and H. H. Crosby resigned as officers and directors of Goodyear and became the officers and directors of the new company. Goodyear owns no stock in Crosby Naval Stores, Inc., but as of the date of the trial owned $409,000 worth of bonds of that company, secured by a mortgage on the plant. L. O. Crosby, Sr., owns

428

no stock, notes or bonds issued by Crosby Naval Stores, Inc. Upon the organization of that company on November 1, 1938 Goodyear transferred the naval stores manufacturing to it by a deed (Dfts. Ex.' 137) in consideration for the sum of $605,-528.64. Since November 1, 1938 Goodyear has had no part in the naval stores manu-. facturing business other than that of a holder of bonds secured by a mortgage on the plant.

35. Goodyear Yellow Pine Company, owning cut-over timber land, desired to clear the stumps therefrom to fit the land for planting of tung groves. L. O. Crosby, Sr., President of that company, wished to have a plant erected, in the vicinity of Picayune, Mississippi, for the extraction of turpentine, dipentine, pine oil, and wood rosin from these stumps. He approached both plaintiff and Hercules Powder Company, unsuccessfully, regarding the erection of such a plant and, thereupon, Goodyear decided to and did erect and operate a plant for the production of FF wood rosin, which was put in operation about November 1, 1937. Goodyear, through Knapp, applied to plaintiff for a license under plaintiff's patents on the pale rosin process but such license was refused in August, 1937, and Goodyear set itself to the task of finding a decolorizing process not involving the use of fuller's earth. As the result of the research of Knapp and Price, Price developed the Coenite process for the production of pale wood rosin, now used by defendant, Crosby Naval Stores, Inc., and that process was put into use by said defendant, for the commercial production of pale wood rosin, after the sale of the Goodyear plant and wood distillate business to that company on November 1, 1938.

36. Both plaintiff and Crosby Naval Stores produce FF wood rosin from the pine stumps by a process in which the wood is first broken up and shredded in a hog mill and a shredder, and the wood chips placed in extractors where they are. extracted with hot naphtha. The naphtha extract, known as drop solution, is washed with water causing separation of a pitchy material known as nigre. The washed drop solution passes into a refinery where the naphtha and terpenes are separated from the rosin. The naphtha and terpenes are fractionated in stills to give naphtha, turpentine, dipentine and pine oil. The rosin remaining after separation in the refinery is drummed and sold as commercial FF

wood rosin or, if it is desired to produce pale wood rosin, re-dissolved in naphtha to produce a rosin solution for decolorizing. The foregoing process has been in use for many years, is open to use by defendants or anyone else, and is not an infringement in this action.

37. The process of producing pale wood rosin and the method of revivification used by defendant, Crosby Naval Stores, were patented to it by U. S. Patent, No. 2,181,-791, granted November 28, 1939, on the application of Robert E. Price, filed December 15, 1938 (Dfts. Ex. 67A).

38. U. S. Patent in suit, No. 1,807,599 (Pl. Ex. 26) was granted June 2, 1931, on an application filed December 26, 1929, by Robert C. Palmer, John L. Burda and Anthony F. Oliver, for Process of Purifying Rosin. The certified copy of the file-wrapper and contents (Dfts. Ex. 116) shows that the application was allowed, as filed, without rejection or citation of preferences.

39. Plaintiff uses Floridin fuller's earth in its commercial operations under patent No. 1,807,599. Burda used Floridin in the experiments leading up to the plaintiff's commercial process. Plaintiff, in the test of November, 1940 (Pl. Ex. 37) to produce pale wood rosin by the process of patent No. 1,807,599, used Floridin. Brooks and Marshall, in comparing fuller's earth and Coenite, used Floridin as representative of fuller's earth. The fuller's earth mentioned in and contemplated by the patent was Floridin.

40. The fuller's earth contemplated by the patent in suit, No. 1,807,599, differs from Coenite, the decolorizing agent used by Crosby Naval Stores, in chemical constitution and physical characteristics. Fuller's earth is plastic, Coenite is not. Fuller's earth muds or slimes in the presence of water, Coenite does not. Drying to remove excess moisture improves the decolorizing value of fuller's earth, but impairs that of Coenite. Under normal operating conditions, fuller's earth tends to lower the optical rotation of rosin, while Coenite does not. Coenite and fuller's earth are not the same materials.

41. Defendants were led to obtain Coenite for tests by the description in the Prutzman and Bennison patent, No. 1,598,255 (Dfts. Ex. 123), pointing out the differences between that material and fuller's earth. Their tests confirmed that the differences existed and showed the value of

Coenite for decolorizing rosin. They did not believe that Coenite was fuller's earth and did not want to use fuller's earth.

42. Patent No. 1,807,599 describes, as one of the characteristics of fuller's earth, that an improved color grade of rosin will be produced by filtration of an FF rosin solution containing a given quantity of rosin, through a given quantity of fuller's earth, as compared with the rosin produced by filtering a crude rosin extract, containing the same amount of rosin, through the same amount of fuller's earth. No improvement in grade of rosin results from filtering an FF rosin solution, instead of a rosin extract containing the same amount of rosin, through Coenite, conditioned for use in accordance with the commercial procedure of Crosby Naval Stores. The improvement in grade resulting from the substitution of FF rosin solution for crude drop liquor, which is one of the objects of the patent in suit, is not realized when Coenite is used instead of fuller's earth.

43. Patent No. 1,807,599, in suit, describes as one of the characteristics of fuller's earth, that it will polymerize terpenes contained in a naphtha solution passed through it under the conditions in which the fuller's earth is used for decolorizing rosin. Coenite, under the conditions of its use by Crosby Naval Stores for decolorizing rosin, does not polymerize terpenes contained in a naphtha solution passed through it.

44. Fuller's earth is a variety of clay that has high capacity for adsorbing basic colors and can remove these colors from solution in animal, vegetable or mineral oils, as well as from some other liquids, especially water. Like all other clays, fuller's earth is a hydrous aluminum silicate containing small proportions of other substances. Coenite, the natural magnesium silicate used by Crosby Naval Stores, is not fuller's earth.

45. Coenite is not an equivalent of fuller's earth in the decolorizing of rosin.

46. Patent No. 1,807,599, in suit, contemplates the production of a terpene-free rosin solution for filtration through fuller's earth. Crosby Naval Stores does not filter a terpene-free rosin solution through Coenite, but its FF rosin solution is made from naphtha contaminated with terpenes and contains substantial amounts of terpenes.

47. In the Crosby process, there is but a single nigre-removal step applied to the FF rosin solution, not the two steps of cooling and washing described in the patent No. 1,807,599, and specified in claim 7 thereof.

48. Defendants do not employ the process described in and covered by the patent in suit, No. 1,807,599. They do not use fuller's earth as a decolorizing agent and do not filter a terpene-free rosin solution through Coenite. The Crosby process is not an infringement of said patent.

49. Patent No. 1,794,537, in suit (Pl. Ex. 24), was granted March 3, 1931, on an application filed by Robert C. Palmer on December 24, 1927, for a Process of Treating Decolorizing Agents. The application for this patent was allowed as filed except for minor changes in the claims, claim 1 having been amended to distinguish from Robinson, 1,403,198 (Dfts. Ex. 82) which showed the revivification of fuller's earth spent in decolorizing hydrocarbon oils, by treatment with isopropyl alcohol. Patent No. 1,794,539, in suit, was granted on March 3, 1931, also, on an application for a Process of Revivifying Adsorbent Material filed by Robert C. Palmer on January 2, 1930, and claimed to be a continuation in part of the earlier application on which patent No. 1,794,537 was granted. The claims, as first presented, were allowed, with slight changes, on the theory that they were limited to the revivification of fuller's earth contaminated with rosin impurities and did not apply to the use of the same mixture as an agent for revivifying fuller's earth exhausted in decolorizing petroleum oils.

50. In the method of revivification used by Crosby Naval Stores, the Coenite is revivified by washing with hot 95% ethyl alcohol. That method does not include the essential step of the method patented by the revivification patents, in suit, that is, the washing of fuller's earth with a previously prepared solution of alcohol in naphtha.

51. The revivification patents, Nos. 1,-794,537 and 1,794,539, ascribe to the method disclosed therein of treating the fuller's earth with a previously prepared solution of alcohol in naphtha, the advantages of saving alcohol and a more efficient system for recovering alcohol. The alcohol is not separated, as such, but recovered as an alcohol-naphtha solution in the right proportions for re-use. Crosby Naval Stores does not realize either of these advantages, in

its method, in which 95% alcohol is separated and recovered for re-use.

52. The revivifying step used by Crosby Naval Stores, washing with straight alcohol, was acknowledged by Palmer, in patent No. 1,794,537, to be old and that upon which he sought to improve. The Crosby process is not the process patented by Palmer.

53. Crosby Naval Stores does not employ the process of the revivification patents, because of its practice in washing Coenite with naphtha, to remove the rosin solution, before washing with alcohol treatment, to remove the alcohol. These are conventional practices and are not stressed in the patents in suit as of the essence of the alleged invention.

54. The method described in and patented by the revivification patents, Nos. 1,794,537 and 1,794,539, in suit, has not been used by the defendants, or either of them.

55. WW grade wood rosin, produced in accordance with the process of patent, No. 1,810,222, in suit, differs considerably from Crosby WW grade wood rosin, in the characteristics of melting point, acid number, saponification number and specific rotation, and said Crosby WW grade wood rosin resembles very closely, as to said characteristics, the WW grade rosin, Defendants' Exhibits 43 and 59, produced in the test of the prior Cole process, and the X grade wood rosin, Defendants' Exhibit 46, produced in the test of the prior Sherwood and Cole process.

56. There was no contract between Knapp and plaintiff, by which Knapp agreed not to divulge trade secrets learned while in plaintiff's employ. Defendants were not informed as to any confidential relationship between Knapp and plaintiff, but an implied confidential relationship did exist.

57. Knapp did not divulge to defendants any secret processes acquired by him in plaintiff's employ. He disclosed no more than that general knowledge, obtained by reading patents and publications, which taught that alcohol was a good solvent for rosin color bodies adsorbed on fuller's earth.

58. The defendants have not proved the facts alleged in support of their defense of unclean hands. However, the defendants now assert, for the first time, that plaintiff and Hercules Powder Company entered into an agreement to maintain prices for unpatented wood rosin products, and in support of that charge insist that the written contract dated July 14, 1938, between plaintiff and Hercules Powder Company so provides. The defendants did not plead these facts and the evidence fails to prove them. That written contract was entered into between plaintiff and Hercules Powder Company to settle litigation then pending, and the price maintenance clauses there referred to apply only to patented products covered by two patents not here in suit. By that contract plaintiff and Hercules Powder Company did not agree to maintain prices for unpatented wood rosin products.

## Conclusions of Law

1. The court has jurisdiction of the parties and the subject matter.

2. Palmer Patent No. 1,794,537 is owned by the plaintiff and claims 1, 2 and 5 thereof are valid but have not been infringed by the defendants.

3. Palmer Patent No. 1,794,539 is owned by the plaintiff, and claims 1 to 10, inclusive, of that patent are valid but have not been infringed by the defendants.

4. Palmer et al. Patent No. 1,807,-599 is owned by the plaintiff, and claims 1 to 7, inclusive, and claim 10 thereof are valid but have not been infringed by the defendants.

5. Palmer Patent No. 1,810,222 is owned by the plaintiff, and claims 5 and 6 of that patent are valid but have not been infringed by the defendants.

6. None of the prior art patents and publications cited and referred to by the defendants anticipates the claims in suit which are hereinabove held valid.

7. The claims in suit which have heretofore been found to be valid each define patentable invention over each and every one of the prior art references asserted by the defendants in this case.

8. Plaintiff has not established any cause of action, against either defendant, for appropriation of trade secrets.

9. The defendants should have judgment for costs against the plaintiff.

Having reached the foregoing statement of facts and conclusions of law, it is not necessary to elaborate further, other than to state briefly a few of the pertinent reasons underlying my judgment.

The cause has been fully and ably presented by skillful and thorough attorneys on each side. The questions presented are highly technical and the very able and highly educated experts conflict in their conclusions and therefore presumptions of law and fact have great weight.

■■■ The issuance of a patent raises a presumption of validity and this presumption prevails until overcome by evidence convincing of error. This is a strong presumption and in cases where the evidence is evenly balanced will be sufficient to tip the scales in favor of validity. Radio Corp. v. Radio Laboratories, 293 U. S. 1, 55 S.Ct. 928, 79 L.Ed. 163. This presumption also applies to the Price patent. Boyd v. Janesville Hay-Tool Co., 158 U. S. 260, 15 S.Ct. 837, 39 L.Ed. 973. It is presumed that the patent office considered the two methods, and after such consideration, concluded that the Price patent showed invention. Fairbanks, Morse & Co. v. Stickney, et al., 8 Cir., 123 F. 79. It is urged on me that the Price patent was procured through fraud. The evidence is insufficient to show fraud and it is well settled that fraud is never presumed, but must be shown by clear and convincing evidence. If it be true that Coenite is a fuller's earth, then there was a misrepresentation and the contention of plaintiff would be well taken, and the authorities relied upon by it would be applicable. However, Coenite is not a fuller's earth, but is a magnesium silicate, naturally occurring, and is not the equivalent of a fuller's earth.

It is difficult to find an all-embracive definition of fuller's earth, but as defined by Parsons, it is "a form of clay having a high adsorbent power for many substances, but especially for certain colors when dissolved in oil or in water. Chemically, it is essentially an aluminum silicate having a higher combined water content than most clays, but its chemical composition may vary widely, and indeed seems to have little connection with its bleaching power." It may be said all the definitions refer to it as an aluminum silicate.

It is true that Coenite, prior to the alleged infringement, had been sold and referred to by its vendors as a clay, and while that factor is important in determining the question, yet it is not conclusive. It is one circumstance to be considered along with all the other evidence in the case, and the presumptions of law that may be applicable. All the definitions refer to it as a magnesium silicate.

All of plaintiff's patents are valid. They are not anticipated by the prior art. Root Refining Co. v. Universal Oil Products Co., 3 Cir., 78 F.2d 991; Williams Iron Works Co. v. Hughes Tool Co., 8 Cir., 109 F.2d 500. The discoveries show genius, invention, novelty and usefulness. The prior art had been striking at the problems, but like a backfield man who could not throw a forward pass right into the arms of the receiver in the end zone, it had missed. Palmer came through on the field and hurled the pass right to the exact spot for the touchdown. He solved the difficult problem for the first time. However, because of the prior art, these patents should be narrowly construed, rather than given broad construction. Giving them this narrow construction, it is clear there has been no infringement.

■■■ The defendants urge that the suit should be dismissed upon the ground that plaintiff has not come into court with clean hands, and contend that plaintiff, by virtue of its contract with Hercules Powder Company, has violated the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1–7, 15 note. The facts of this case do not bring it within the condemnation of that act. United States v. General Electric Co., 272 U.S. 476, 47 S.Ct. 192, 71 L.Ed. 362; Bement & Sons v. National Harrow Co., 186 U.S. 70, 22 S.Ct. 747, 46 L.Ed. 1058. The principle of law relied upon by defendant is controlling when the facts justify it, and is applicable to a patent case as well as to any other case when plaintiff comes into a court of equity with unclean hands and the facts of the case require the application of that principle. This point is discussed in Keystone Co. v. Excavator Co., 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293.

Let a decree be entered in accordance with this opinion.